BARBER-GREENE AMERICAS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

BARBER-GREENE OVERSEAS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 70334, 70335. Filed November 30, 1960.

*John C. Reid, Esq.*, and *Frank R. Reid, Jr., Esq.*, for the petitioners.
*Charles B. Wolfe, Jr., Esq.*, and *Don S. Harnack, Esq.*, for the respondent.

TIETJENS, *Judge:* The respondent determined deficiencies in income tax in the amounts and for the years set forth below:

---

[1] Cf., e.g., *Poe* v. *Seaborn*, 282 U.S. 101, with *Fernandez* v. *Wiener*, 326 U.S. 340.

| Docket No. | Petitioner | Taxable year ended— | Deficiency |
|---|---|---|---|
| 70334 | Barber-Greene Americas, Inc | June 30, 1953 | $66,020.82 |
| | | June 30, 1954 | 67,446.00 |
| | | June 30, 1955 | 50,966.74 |
| | | July 1, 1955 to Aug. 31, 1955 | 12,303.05 |
| 70335 | Barber-Greene Overseas, Inc | June 30, 1953 | 37,679.49 |
| | | June 30, 1954 | 16,531.29 |

The respondent in his amended answer claimed increased deficiencies.

The issue for decision is whether, during the taxable years, petitioners derived at least 95 per cent of their gross income from sources outside the United States so as to be exempt from excess profits tax pursuant to section 454(f) of the 1939 Code, and to qualify Barber-Greene Americas, Inc., as a Western Hemisphere trade corporation within the meaning of section 109 of the 1939 Code, and section 921 of the 1954 Code.

### FINDINGS OF FACT.

Some of the facts are stipulated, are so found and are incorporated herein by this reference.

Barber-Greene Americas, Inc. (hereafter referred to as Americas), and Barber-Greene Overseas, Inc. (hereafter referred to as Overseas), were at all times material hereto Illinois corporations with their principal place of business located in Aurora, Illinois. Both kept their books and filed their Federal income tax returns for the taxable periods involved on an accrual basis with the director of internal revenue at Chicago, Illinois.

Both Americas and Overseas were organized in January 1952, as wholly owned subsidiaries of Barber-Greene Company (hereafter referred to as Barber-Greene), an Illinois corporation with its main offices and plant at Aurora, Illinois. Barber-Greene was and is a manufacturer of heavy roadbuilding and construction equipment, consisting of asphalt-mixing plants, asphalt-finishing or -paving equipment, and bulk material handling equipment including conveyors and ditchers.

Americas and Overseas were organized to handle Barber-Greene's export business. By agreements entered into on April 1, 1952, Americas obtained the right to market Barber-Greene products in all countries included in the Western Hemisphere as defined in section 109 of the 1939 Internal Revenue Code, and Overseas acquired the right to market such products in all countries throughout the world excepting the United States and those defined Western Hemisphere trade countries. Neither Americas nor Overseas obtained an exclusive right to sell these products in the enumerated territories, and both were permitted to market the products of Barber-Greene Olding & Co., Limited, and Barber-Greene Canada, Limited, as well as Barber-Greene prod-

ucts manufactured anywhere else under license or with approval of Barber-Greene.

In general, Overseas purchased products from Barber-Greene and marketed them to customers in Europe, Asia, Africa, and Australia through dealers located in those areas. Americas purchased Barber-Greene products and marketed them to customers outside the United States in North, Central, and South America, and the West Indies through dealers located in those areas.

Americas and Overseas appointed dealers to sell Barber-Greene products in their respective sales territories. The only exceptions were Americas' Canadian sales, all of which were made to Barber-Greene Canada, a Canadian corporation which was a wholly owned subsidiary of Barber-Greene with manufacturing facilities located in Toronto. Some dealers stocked Barber-Greene products for display purposes. Most kept a stock of repair parts to meet emergency requirements of their customers. The dealers solicited orders for Barber-Greene products in their territories and filled those orders by purchasing the products ordered by their customers from or through Americas or Overseas.

By virtue of its appointment contract, a dealer was granted an exclusive dealership for the sale and service of the supplier's (Americas' or Overseas') products in a designated territory. Petitioners, however, retained the right to sell to the United States Government, nationals, citizens, or corporations for use in the dealer's territory. The dealer was not made petitioners' agent. In consideration of its franchise, the dealer agreed to give active sales coverage in its territory to petitioners' products, to purchase products from supplier for resale to the dealer's customers, and to sell only to prospects with regularly established businesses in its territory. While it was precluded from selling competing products, it was free to carry noncompeting lines. The price to the dealer was petitioners' price on the shipment date, plus any tax, import, excise, duty, or penalty required of petitioners, as well as items of boxing, freight, insurance, duty, and other items paid or to be paid by the petitioners. Discounts to the dealer were to be computed on the consumer's net prices as invoiced f.o.b. Aurora, Illinois. Amounts for boxing, freight, insurance, special engineering, sales and excise taxes, and similar charges were not to be included in computing the price upon which the discount was allowed. Orders were noncancelable except with petitioners' consent. However, petitioners retained the right to refuse any order which might be submitted by the dealer. Petitioners agreed to pay one-half the cost of any joint advertising in local publications as mutually agreed upon, and the dealer agreed to mail at its own expense to its customers and prospects any promotional literature furnished by petitioners. While petitioners agreed to make

deliveries as nearly as possible on dates promised, it was stipulated that they were not to be held responsible for damage or loss on account of delays.

The dealer's contract also provided:

14. RETENTION OF TITLE

Supplier will assume all risks to the merchandise from warehouse to warehouse and accordingly shall retain title to the goods until the shipment reaches a port of entry to, or a port of discharge in Dealer's country. It is agreed that the ownership of, the legal title to, and the right of possession and control over merchandise which is shipped under this contract shall remain with Supplier until the shipment actually reaches a port of entry to, or a port of discharge in Dealer's country. The time, method, place or medium of payment; the method of shipment, whether by air, rail, maritime freight or parcel post, or by combination of any two or more of them; the manner of consignment, whether to the seller, his agent, the purchaser or his agent, or to an agent for both shall not in any way limit or modify the rights of Supplier as the legal owner of the goods, to have control over and the right to possession of them during the course of shipment and until they reach the port of entry.

In addition to dealers, Americas and Overseas appointed agents in the various foreign countries to which their goods were shipped who were authorized to endorse shipping documents on their behalf. The appointment letters were in substantially the following terms:

We hereby constitute and appoint you as our endorsement representative for the sole and limited purpose of endorsing insurance policies and bills of lading and writing delivery orders addressed to air carriers and postmasters at various locations in your country, instructing and authorizing them to deliver to customers air shipments or parcel post packages which will be shipped to the undersigned [Americas or Overseas] as consignee.

Petitioners usually designated a bank or a customs broker or sales representative in the destination country to serve as their endorsing agent. The negotiable documents relative to a particular transaction were usually sent to their foreign destination by airmail. Upon receipt of these documents, the endorsing agent would endorse them on behalf of Americas or Overseas, and deliver them to the customer or representative.

Except for Americas' Canadian sales, the marketing and sales procedures of Americas and Overseas were identical. The equipment in which they dealt was large technical equipment and usually required from 2 weeks to 3 months to produce. When a dealer received an inquiry from a customer expressing an interest in specific equipment, he would request from Americas or Overseas a firm quotation. The quotation would be issued on a "pro-forma invoice," stating the specifications of the equipment offered, its price, and the terms of delivery.

All pro forma invoices issued by the petitioners contained a statement to the effect that:

Legal title to control over and the right of possession to the merchandise described in this pro-forma invoice shall remain in the seller and at his own risk until the shipment reaches the point of entry.

These invoices also included the abbreviations "F.O.B.," "F.A.S.," and "C.I.F.," which were used as pricing terms to show the computation of the delivered price. An example of such a pro forma invoice, issued to Matermaco-Congo, Overseas' dealer in the Belgian Congo, in connection with the sale of an asphalt plant in 1954, follows:

| | |
|---|---:|
| Customer's price f.o.b. Aurora | $33,915 |
| Dealer's price f.o.b. Aurora | 27,810 |
| Partial boxing | 425 |
| Freight to New York | 744 |
| Forwarding fees | 50 |
| Dealer's price f.a.s. New York | 29,029 |
| Ocean freight | 3,990 |
| Insurance | 165 |
| Dealer's price c.i.f. Matadi | 33,184 |

The above f.o.b. Aurora and Boxing prices are firm for 90 days. All freight, insurance and forwarding fees are estimated, and these items will be billed at actual cost at time of shipment.

The quotation was made in this manner to show the dealer the actual breakdown of the final delivered price. This was necessary because: (1) The dealer's discount was computed with reference to the ultimate customer's list price at the factory, no discount being allowed on the cost of boxing, freight, insurance, or other shipping charges; and (2) shipping and insurance costs were only estimated. The c.i.f. price to a foreign dealer differed from the c.i.f. price to a foreign dealer's customer, in that the former was less all dealer discounts, whereas the latter was not.

Where the terms of the pro forma invoice were acceptable to the dealer and his customer, a purchase order would be forwarded to Americas or Overseas by the dealer. Pursuant to instructions issued by petitioners, purchase orders were to contain a clause providing that title to the goods described therein would remain in the seller until the shipment reached the foreign port of entry in the buyer's country. If the order failed to contain the title retention clause, the order was either to be returned to the dealer for the insertion of such clause, or the dealer was, by separate letter, to indicate his assent that title remain in the shipper until the goods reached the port of entry in his country.

Upon receipt of the purchase order, Americas or Overseas would purchase the ordered equipment from Barber-Greene. Because of the size and complexity of the equipment, it was usually made to order by

Barber-Greene. The goods were then shipped to their foreign destination, normally consigned to the order of Americas or Overseas, with instructions to notify the dealer or customer. Certain South American countries did not permit shipment on order bills of lading. In these instances the goods would be consigned to Americas in care of a customs broker serving as its endorsing agent. Orders shipped to Brazil were consigned to a Brazilian bank, the necessary documents on such shipments being sent to Americas' endorsing agent who would deliver them to the bank for endorsement and delivery to the customer.

Where equipment was to be shipped partially by ocean freight, Barber-Greene generally shipped it to a United States port for export. Accompanying such shipments would be the following documents:

> Export license.
> Inland bill of lading.
> Export shipping instructions.
> Insurance certificates.
> Ocean bill of lading.
> Invoice.
> Shipping export declaration.
> Export packing list.

Americas or Overseas made application for the necessary export licenses from the United States Department of Commerce. Export shipping instructions were mailed by Americas or Overseas to the freight forwarder at the United States port. Pursuant thereto, the freight forwarder secured a bill of lading from the ocean cargo shipper, and completed the commercial invoice by adding to it the cost of ocean freight and marine insurance if prepaid by the petitioners. The freight forwarder also completed an insurance certificate on the shipment, issued under an open marine policy. The shipment was insured for approximately its c.i.f. (cost, insurance, freight) value plus 10 or 25 per cent thereof to the port of foreign entry. Such insurance was made payable to the order of Americas or Overseas.

Americas and Overseas carried insurance on their ocean shipments with Sun Insurance Office Ltd., until December of 1952. After that date, their insurance was carried with Fireman's Fund Insurance Company. Americas was named the assured in its policies, and Overseas was the named assured in its policies. Any losses were made payable to the "assured or order." These policies contained the following clauses:

> VALUATION 5. Valued at amount of invoice, premium included plus all charges, commissions prepaid and/or advanced and/or guaranteed freight if any and 10% added thereto. Provided however that on shipments where the Assured has received instructions to insure for a higher percentage of advance than 10% such higher percentage shall be substituted in the foregoing clause subject however to a maximum advance of 25%.

INTEREST 6. To cover all shipments made by the Assured or by others for their account or control of in which they may have an interest, but excluding such shipments as are bought by them on C.I.F. terms, or sold by them against cost and freight orders or under terms which do not provide for insurance being placed by the Assured, also to cover all shipments for which the Assured may receive instructions to insure, such instructions being given in writing prior to sailing of vessel and before any known or reported loss or accident.

\* \* \* \* \* \* \*

WAREHOUSE TO WAREHOUSE CLAUSE 12. This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the policy for the commencement of the transit and continues during the ordinary course of transit, including customary transhipment if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur. The time limits referred to above to be reckoned from midnight of the day on which the discharge overside of the goods hereby insured from the overseas vessel is completed. Held covered at a premium to be arranged in the event of transhipment, if any, other than as above and/or in the event of delay in excess of the above time limits arising from circumstances beyond the control of the Assured.

Under these policies Americas and Overseas were authorized to issue insurance certificates covering individual shipments, and the insurance companies provided blank certificate forms for this purpose. The insurer received copies of the certificates issued by petitioners, and billed them on a monthly basis for the insurance so issued. On inland shipments petitioners carried insurance under a policy with Millers National Insurance Company with respect to which no certificates were issued.

In some instances, either because of the purchaser's request or because currency restrictions which precluded the requisition of dollars for that portion of the purchase price presumed attributable to insurance costs, insurance would be written under the purchaser's open cargo policies. In these instances petitioners "and/or" the purchaser were named as insureds "as their interests may appear." Petitioners also obtained their own insurance on these shipments, known as contingent insurance, to provide additional protection should the purchaser's policy not compensate for the entire loss. Where the purchaser insured the merchandise, petitioners required the execution in advance of shipment of an agreement which read:

It is agreed by and between the buyer and the seller that the taking out of insurance on the merchandise in transit to the importing country does not alter the basic agreement between the buyer and the seller that the legal title to the merchandise sold to the buyer shall remain in the vendor until the merchandise reaches the port of entry in the importing country.

The valuation used for contingent insurance purposes was based on a fluctuating percentage of the factory price, plus boxing, process cost,

and inland freight. It did not include an amount to cover ocean freight.

Upon shipment of the equipment, the shipping documents were forwarded either directly, or through banking channels, to the endorsing agent who would endorse them on petitioners' behalf and deliver them to the customer or representative. On each shipment a letter would be sent the endorsing agent confirming his authority to act as such on petitioners' behalf, and giving specific instructions relative to the endorsement of the bill of lading and insurance certificate. The endorsing agents were to endorse and deliver to the purchaser's bank the negotiable papers on their receipt, not holding them for the arrival of the ship carrying the merchandise.

Petitioners received payment for their goods under several arrangements; principally "open account," "sight draft," "time draft," and "letter of credit." When a sale was made on open account, an invoice would be sent the customer who in turn would remit payment. In certain instances, cash discounts were allowed for payment within 10 days after receipt of endorsed documents by the customer. These documents were airmailed by the freight forwarder to petitioner's foreign endorsing agent.

When a sale was made on a sight draft basis, payment would be received through a bank, usually the First National Bank of Chicago, acting as collecting agent. After shipment, the unendorsed bill of lading, unendorsed insurance certificate, and other shipping documents attached to a draft in the amount of the purchase price would be sent to a correspondent bank in the foreign country to which shipment was being made. This bank would arrange with the endorsing agent to have the documents endorsed upon payment and the money would be remitted by the correspondent bank to the First National Bank which would credit petitioner's account. Interest was charged to the purchaser at the rate of 6 per cent per annum on the amount of the draft from the date of draft to approximate arrival of remittance in Chicago.

The same general procedure as in the case of a sight draft was used where payment was made on a time draft, except the purchaser would accept the draft upon endorsement instead of making payment at that time, payment of the draft being made at some later date.

Where payment was to be made under a letter of credit, the buyer would open an irrevocable letter of credit in a bank in his country which would be confirmed by a United States bank. After the goods had been loaded for shipment on the ocean cargo vessel the freight forwarder sent to the United States confirming bank the unendorsed bill of lading, unendorsed original insurance certificate, and other shipping documents, together with the completed commercial invoice and a

draft in the appropriate amount. The confirming bank then air-mailed the controlling documents to the foreign opening bank, which arranged with petitioners' endorsing agent for endorsement of the documents. Upon receipt of cabled notice from the foreign bank that the shipping documents had been endorsed, the United States bank would release the funds to petitioners. Under an alternate arrangement, the confirming bank would release the funds, prior to receipt of the cabled notice of endorsement of the documents in the foreign country. In such a case the unendorsed documents were still transmitted by the confirming bank to the buyer's country for endorsement by petitioners' appointed endorsing agent.

All Americas' Canadian sales were made to Barber-Greene Canada Ltd. (hereafter referred to as Canada), a Canadian corporation which was a wholly owned subsidiary of Barber-Greene. Canada maintained manufacturing facilities in Toronto. On April 1, 1952, Americas entered into an agreement with Canada whereby the latter was appointed Americas' sole distributor for the Dominion of Canada, excluding Newfoundland. On April 2, 1954, the distributorship was extended to include Newfoundland. The appointment contract provided that Americas would retain ownership of merchandise until it reached a port of entry in Canada.

Canada placed orders with Americas on a standard form entitled "Offer to Purchase," wherein was described the equipment desired and the shipping instructions. Printed therein was the following clause:

IMPORTANT: The legal title to the merchandise specified in this offer to purchase shall remain in Barber-Greene Americas, Inc. until the shipment reaches the port of entry in Canada.

Acceptance of the offer was noted on a duplicate of the "Offer to Purchase" and returned by mail to Canada. Americas then placed an order with Barber-Greene for the goods specified by Canada, this order being made on a standard purchase order form, wherein was designated the equipment desired. This purchase order contained the following clause:

IMPORTANT: When shipped, Title shall pass to Barber-Greene Americas, Inc. and shall remain in Barber-Greene Americas, Inc. until the shipment reaches the port of entry in the importing country.

The equipment, after manufacture, would be shipped by Barber-Greene by rail in accordance with Canada's instructions, consigned on a rail bill of lading to Americas or its order at the Canadian destination point, with instructions to notify Canada's dealer. A "Transfer Invoice," a document used in clearing the shipment through Canadian Customs, was prepared by Americas dated on the date the equipment was shipped from Aurora. This invoice indicated a billing from Canada to a Canadian buyer; showed that the equipment was being

shipped to the Canadian buyer f.o.b. Aurora; provided a cash discount to the buyer for payment within 10 days from its date; and contained the following language:

IMPORTANT: Legal title to the merchandise specified in this invoice shall remain with Barber-Greene Americas, Inc., until the shipment reaches the point of entry in Canada.

The bill of lading, transfer invoice, and a form entitled "Invoice of Merchandise Purchased" were then sent to one of Americas' endorsing agents in Canada, with instructions to endorse the bill of lading on behalf of Americas, and to complete the transfer invoice. The Invoice of merchandise purchased contained a clause similar to that on the transfer invoice set forth above. These documents were sent on the same date the equipment was shipped from Aurora. Freight on these shipments was collect from Aurora, and was paid by the ultimate Canadian purchaser. All Americas' Canadian sales were on open account.

On shipments to Mexico, the equipment would be consigned either to the order of Americas in care of a customs brokers in Laredo, Texas, or directly to the customs broker. The broker was authorized to accept and endorse the bill of lading. The broker would reconsign the shipment from Laredo to the order of Americas at the ultimate Mexican destination on a Mexican rail bill of lading. This procedure was followed because of a Mexican requirement that shipments within that country be made only on Mexican bills of lading.

Both Americas and Overseas had employees who traveled extensively in the countries in which their products were marketed. These employees supervised the dealer activities in those countries, educated the dealer's personnel, and rendered technical and engineering assistance to the dealers and their customers.

On their books and tax returns for the years here involved Americas and Overseas treated a sale as not having been made until the goods involved reached the foreign port of entry. Shipments made toward the end of a fiscal year which had not arrived at the foreign port of entry on the last day of the fiscal year were not included in sales for the year of shipment inventory and were recorded as sales for the following year. Set forth below are figures relative to the shipments included in in-transit inventories at the end of various fiscal years:

| Overseas | | | |
| --- | --- | --- | --- |
| Fiscal year ended— | List price | Dealers and cash discounts | Cost of sales |
| June 30, 1952 | $43,027 | $9,245 | $27,090 |
| June 30, 1953 | 218,383 | 38,689 | 143,304 |
| June 30, 1954 | 232,568 | 37,442 | 143,406 |

| Americas | | | |
|---|---|---|---|
| June 30, 1952 | $148,220 | $11,865 | $99,268 |
| June 30, 1953 | 151,586 | 25,154 | 96,212 |
| June 30, 1954 | 77,083 | 5,326 | 42,816 |
| June 30, 1955 | 334,314 | 17,752 | 195,105 |
| Aug. 31, 1955 | 317,466 | 46,720 | 209,037 |

On its tax returns for the fiscal years or periods ended June 30, 1952, June 30, 1953, June 30, 1954, June 30, 1955, and August 31, 1955, Americas showed the receipt of interest and commissions as follows:

| Fiscal year ended— | Interest received | Commissions |
|---|---|---|
| June 30, 1952 | $248.83 | |
| June 30, 1953 | 2,618.43 | |
| June 30, 1954 | 12,553.40 | $4,404.09 |
| June 30, 1955 | 9,445.92 | 2,591.48 |
| Aug. 31, 1955 | 2,497.55 | 12,500.94 |

On its tax returns for the fiscal years ended June 30, 1952, 1953, and 1954, Overseas showed the receipt of interest and commissions or area manager's fees as follows:

| Fiscal year ended June 30— | Interest received | Commissions or area manager's fees |
|---|---|---|
| 1952 | | $3,011.61 |
| 1953 | $368.78 | |
| 1954 | 1,504.26 | 19,011.32 |

Except for these items of interest and commissions all Americas' and Overseas' gross income for the fiscal periods referred to above was derived from the purchase and resale of Barber-Greene equipment.

The interest shown above represented interest received by Americas and Overseas from customers on deferred payment sales, such as time draft sales or installment sales. The commissions or area manager's fees shown above represented amounts received from Barber-Greene Olding, Ltd., an English company with manufacturing facilities in England in which Barber-Greene Company owned a 51 per cent stock interest. Barber-Greene Olding paid Americas or Overseas a fee or commission of 5 per cent of the list price when it made a sale in the sales territory of Americas or Overseas to reimburse the latter for the sales promotional efforts expended by them in behalf of Barber-Greene products in their respective sales territories. Sales by Barber-Greene Olding in Americas' or Overseas' territory occurred in cases where the country in which the customer was located lacked United States dollars but had available pounds sterling, in which case an English machine would be specified. The basis for this charge or payment was

that sales by Barber-Greene Olding in Americas' or Overseas' territories resulted to a considerable extent from the sales activities of Americas or Overseas, rather than from Olding's own sales efforts, inasmuch as Olding had no sales representatives traveling these territories, and that the value of this service and effort should be recognized by the payment of a fee or commission to Americas or Overseas by Olding when it made a sale in the sales territory of one or the other of those companies. Barber-Greene Company acted as the disbursing agent for Olding with respect to these fees.

Gross income derived by Americas and Overseas from the sale of Barber-Greene products, adjusted for dealers' discounts, was as follows:

| Fiscal year ended— | Gross income before dealers' discounts | Dealers' discounts | Gross income |
|---|---|---|---|
| Americas | | | |
| June 30, 1952 | $262,981.37 | $73,931.39 | $189,049.98 |
| June 30, 1953 | 664,394.41 | 319,447.03 | 344,947.38 |
| June 30, 1954 | 899,066.50 | 352,013.29 | 547,053.21 |
| June 30, 1955 | 1,054,391.12 | 435,428.61 | 618,962.51 |
| Aug. 31, 1955 | 204,562.37 | 84,772.00 | 119,790.37 |
| Overseas | | | |
| June 30, 1952 | 7,228.90 | 1,975.70 | 5,253.20 |
| June 30, 1953 | 572,328.08 | 222,645.44 | 349,682.64 |
| June 30, 1954 | 534,309.39 | 173,191.49 | 361,117.90 |

The gross income shown above includes interest and commissions or area manager fees totaling $46,860.64 in the case of Americas and $23,895.97 in the case of Overseas.

The income derived by Americas and Overseas from goods sold under the contracts described herein was from sources outside the United States.

The facts of certain sales are stated below:

*Rio de Janeiro transaction.*—Under date of October 14, 1953, the road maintenance department of the Brazilian State of Rio de Janeiro, herein referred to as the department, wrote Americas stating in part:

We take pleasure in advising you that some equipment manufactured by you were included among the road building machines approved by the competent authorities of the Government of the State of Rio de Janeiro for purchase by this Department * * *

The letter asked for quotations on a Model 879–A Finisher.

Americas replied to the department by letter dated October 22, 1953, giving a firm quotation, and stating in part:

In this case the order should be made out directly to the Barber-Greene Co., Aurora, Illinois, but we will still act as guarantors of the above conditions.

An Americas pro forma invoice dated November 3, with covering letter, stating terms f.o.b. New York was sent the department. In the covering letter it was noted that there was some doubt as to whether "it would be possible to effect the shipment of this Finisher as a Barber-Greene Americas order, or whether it would be necessary to ship as a Barber-Company order." Americas received the department's order for the equipment on January 8, 1954, and accepted it by letter dated January 12, 1954. The order was entered as a Barber-Greene Company order on the records of that company, and given G.O. No. 68894, a number series used by Barber-Greene Company, and not by Americas. By letter dated January 21, 1954, Americas received notice that the department had obtained an import license. On or about February 1, 1954, the Bankers Trust Company issued an irrevocable letter of credit made out to Americas in the total amount of $15,905 with an expiration date of March 10, 1954. On January 25, 1954, Americas applied for an export license. On February 5, 1954, Barber-Greene wrote the Department and acknowledged receipt from the bank of the letter of credit. A copy of this letter was sent to one of Americas' traveling representatives in South America with a postscript stating in part:

> This letter of credit is strictly an old style credit made out to Barber-Greene Company, and the order of course is strictly to Barber-Greene Company. We have sent copies of all our correspondence on this order to Rio and Sao Paulo and we cannot even find one acknowledgment of our correspondence from the dealer. I don't know whether the dealer tried to convince the state of the proper method of making out the letter of credit or not. However, rather than struggle with changing things over to Barber-Greene Americas we have elected to put it in as a Barber-Greene Company order.

On February 17, 1954, Fireman's Fund Insurance Company issued an insurance certificate on the shipment of the equipment payable to the order of Americas. On February 14, 1954, the shipping company designated by the department wrote Barber-Greene confirming previous advice concerning the shipping instructions which had been given Barber-Greene with respect to this particular transaction. The Shippers Export Declaration dated February 19, 1954, stated that the shipment was being made by Americas. The invoice dated February 19, and Memorandum of Foreign Shipment (Export Packing List) showed Barber-Greene as the seller and shipper. On or about March 5, 1954, Americas forwarded a sight draft and other required documents, including an invoice from Barber-Greene, to Bankers Trust for payment of the letter of credit. The Finisher was shipped by Barber-Greene Company and consigned to Lloyd Brasileiro, the shipping company designated by the department, at New Orleans, arrival notices being addressed to Barber-Greene. Shipment of the order was made on board the SS *Loide Panama*, which sailed from

New Orleans on March 6, 1954. Americas' New York area representative endorsed the insurance documents in the name of Americas on March 9, 1954. On March 11, 1954, in a letter to Soc. Tecnica de Materiais, "SOTEMA," S.A., an Americas dealer, Americas stated in part:

Apparently no covering order was ever sent either by your Rio Office nor by you, nor would it appear as a result that payment of the accounts was guaranteed by you. As the Letter of Credit [was] established by the customer, and the transaction handled strictly in accordance with the stipulations of this government body, we feel that we have been to some extent penalized, because, in order to utilize the credit established, it was impossible in the time allowed, to have it revised to permit us to retain title. For that reason, the consignment is shown to be directly to Governo Do Estado Do Rio De Janeiro.

On March 12, 1954, Americas received a Bankers Trust check for $15,809.14, which was immediately transferred to Barber-Greene. The Memo of Funds Received in Americas' file showed "(Handled by B–G Americas for account of B–G Company)." This transaction was reflected on the books and records of both Americas and Barber-Greene as a Barber-Greene sale. No part of the gross income derived was retained or reported by Americas.

*Uruguayan transaction.*—Storer & Cia., Americas' franchised dealer in Montevideo, Uruguay, wrote Americas' traveling representative on February 5, 1952, with respect to a proposed purchase of equipment by the Uruguayan Ministry of Public Works. Two Uruguayan engineers were then traveling to Washington, D.C., to inspect equipment of the type manufactured by Barber-Greene, and it was recognized by Americas' sales force that they might possibly purchase from a competitor. On March 20, 1952, Americas wrote the engineers in Washington, quoting prices on the equipment. The letter contained the following paragraph:

It will be necessary that the legal title to the merchandise specified in the above proposal shall remain with us until the shipment reaches the port of entry in Uruguay.

Each page of this letter was signed by both engineers. On March 21, 1952, Americas wrote the engineers acknowledging receipt of a letter from them of that date "concerning the purchase of two model 845 Plants and two Finishers." The letter went on to say:

This letter will serve to inform you that we accept your order and will ship the equipment together with accessories and spare parts, during the month of May 1952, contingent upon receipt of the proper letter of credit.

On March 28, 1952, application for an irrevocable letter of credit in the amount of $267,000 was made with the Chase National Bank of New York for the account of Ministerio de Obras Publicas of Uruguay, in favor of Americas. Eighty-five per cent of the c.i.f. invoice value of the goods was to be made available against drafts presented

to the bank, and 15 per cent of the invoice value was to be made available upon receipt of a cable from the Banco de la Republica, Montevideo, Uruguay, stating that a signed certificate had been received from a representative of the Ministry and a representative of Americas stating that installation of the equipment has been completed and that title has been transferred to the Ministry. Attempts were made to have the application modified so as to provide for payment of the 15 per cent on December 1, 1952, whether or not the cable from Banco de la Republica had been received; however, this was rejected by the purchaser. Due to problems regarding currency restrictions, lack of funds on the part of the engineers, and delays by the Ministry, the letter of credit was not issued until June 2, 1952. By that time the goods had been shipped from Aurora by rail to Baltimore, with instructions not to unload until further directions. Letters of credit in the respective amounts of $12,630 and $206,290.26 were issued by Chase National in favor of Americas for the equipment, and freight, insurance, and packing charges in connection with its shipment. The $12,630 letter of credit covered freight, insurance, and packing charges, and was to be available upon presentation by Americas to the Chase National of sight draft for such charges and certain other shipping documents. The letter of credit in the amount of $206,290.26, covering 100 per cent of the invoice value of the equipment was made payable to Americas upon its presentation to the Chase National of sight draft for 85 per cent of invoice value, and other specified shipping documents. The letter of credit further provided that the remaining 15 per cent of the invoice value of the equipment would be available against Americas' drafts presented 30 days after completion of its installation to be evidenced by a certificate signed by a representative of the Ministry and of Americas.

The total invoice value of the shipment was $202,722.23, of which the value of the equipment was $165,825.75, and $36,896.68 represented the cost of boxing and export processing, inland freight, marine insurance, ocean freight, etc. Insured value of the shipment was $222,995, the total invoice value plus 10 per cent. The insurance certificate was issued by Americas under its open marine cargo policy, and was payable to "Barber-Greene Americas, Inc. or order." The invoice billing the shipment was dated June 3, 1952, showed the equipment was sold to the Ministry, and shipped to the order of Americas with instructions to notify the Ministry. It also contained the usual retention of title clause.

On June 16, 1952, Americas' freight forwarder transmitted to the Chase National drafts for 85 per cent of the invoiced value of the merchandise plus the required commercial documents, and under separate cover drafts for $8,434.10 plus nonnegotiable copy of ocean bill

of lading, statement of charges, insurance certificates, and letter to endorsing agent authorizing endorsement of insurance certificates. No later than June 21, 1952, Americas received the funds from these sight drafts covering 85 per cent of the purchase price of the merchandise shipped and the cost of boxing, inland freight, and insurance premium.

By letters of June 17, 1952, Americas authorized the Banco de la Republica to act as its agent for endorsing the bills of lading and insurance certificate. The ship upon which the cargo was loaded sailed June 16, 1952, and arrived at Montevideo, Uruguay, on July 8, 1952. An engineer for Americas, under the sales agreement, supervised installation of the plants in Uruguay. The final 15 per cent payment was not received by Americas until February 13, 1953.

Americas reported the Uruguayan transaction as a sale for the taxable year ended June 30, 1952; the gross income reported being $39,954.

*Bolivian transaction.*—Thompson-Cornwall, Inc., was a contractor having offices in Bolivia and other South American countries and in New York. In 1955 it had a contract for paving in Bolivia on the Cochabamba-Montero Highway. After negotiations began relating to sale of Barber-Greene equipment for this contract Americas submitted a pro forma invoice under date of April 30, 1955, quoting a customer's price c.i.f. Antofagasta, Chile, of $159,400 for a complete asphalt plant. The invoice carried the title retention notice described above.

On April 25, 1955, Americas wrote Thompson-Cornwall in part:

Regarding our telephone conversation of this morning, I would like to outline the procedure to be followed in the handling of this order.

(1) We would like to have on the order a clause stating approximately as follows:

"We are forwarding this order to you from our office in Bolivia."

(2) We would also like to have included somewhere on the order the following:

"The legal title to the merchandise specified in this order shall remain with the seller until the shipment reaches the port of entry."

(3) The procedure would be for us to ship to the order of Barber-Greene Americas, Inc. and Ocean Bills of Lading and Insurance Documents would be made out in our name. After shipment, the original Bill of Lading and Insurance Certificate would be sent to our representative, Cia. Importadora Boliviana, S.A., Casilla Correo 954, La Paz, Bolivia, together with a letter appointing them as our authorized representative to endorse the documents in our behalf over to you in Bolivia.

(4) Should you prefer, we can use your forwarder and you are free to arrange all shipments according to your own arrangements, the only stipulation being, that the forwarder must act for us and accept our instructions in the handling of the documents.

(5) CIBO would deliver the endorsed documents to your Bolivian Office. We would then expect your Bolivian Office to cable your New York Office stating that they have received the documents and that everything is in order.

(6) Upon receipt of this cable we would then give you a period of ten days to make payment to us and to qualify for a 2% cash discount passed on the F.O.B. Factory price before boxing.

Title is, of course, transferred to you upon endorsement and delivery of the documents to your Bolivian office by CIBO.

All this, of course, is in line with the Western Hemisphere Trading Corporation under Provision #109 of the Internal Revenue Act of 1941 and also to qualify for a tax reduction which we are passing along to you in this case in the form of a cash discount and what will amount to additional service on the job by *Mike Gailis or one of our factory engineers.*

\* \* \* \* \* \* \*

In the meantime, we are going ahead with plans to manufacture the machines and hope we can have these minor points settled as quickly as possible.

The equipment was shipped from Aurora on June 20 and 24, 1955, consigned to Dumont Shipping Company in New York for shipment to the order of Americas at Antofagasta, in transit to Bolivia, with notice to Thompson-Cornwall. The invoices contained the title retention clause described above. The insurance certificate was made payable to the order of Americas. Americas appointed Compania Importadora Boliviana its agent to endorse bills of lading and insurance upon arrival. Americas received partial payment on July 29 and final payment on August 17. A claim was later made under the insurance coverage for loss from damage or pilferage.

In November 1956 Thompson-Cornwall filed a formal claim for damages incurred in the shipment. The insurer issued a draft in the amount of $1,556.93 payable to Thompson-Cornwall, Inc., and Americas executed a subrogation receipt in favor of the insurer in that amount.

Americas reported this transaction as a sale in the taxable period ending August 31, 1955. The gross income on the sale was $40,614.

## OPINION.

The issues are whether both petitioners qualified for the exemption from excess profits tax granted by section 454(f) of the Internal Revenue Code of 1939, and whether Barber-Greene Americas, Inc., qualified as a Western Hemisphere trade corporation within the meaning of section 109 of the Internal Revenue Code of 1939 and section 921 of the Internal Revenue Code of 1954 and is therefore entitled to the credit provided in section 26(i) of the 1939 Code and the special deduction provided in section 922 of the 1954 Code.[1]

---

[1] I.R.C. 1939
SEC. 454. EXEMPT CORPORATIONS.

The following corporations, except a member of an affiliated group of corporations filing a consolidated return under section 141, shall be exempt from the tax imposed by this subchapter:

\* \* \* \* \* \* \*

(f) Domestic corporations satisfying the following conditions:

(1) If 95 per centum or more of the gross income of such domestic corporation for

In order to qualify under section 454(f) of the 1939 Code, the petitioners must show that during the taxable years 95 per cent of their income was derived from sources outside the United States and 50 per cent of their income was derived from the active conduct of a trade or business. In order to qualify under section 109 of the 1939 Code and section 921 of the 1954 Code, Americas must show that all of its busi-

the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and

(2) If 50 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.

SEC. 109. WESTERN HEMISPHERE TRADE CORPORATIONS.

For the purposes of this chapter, the term "western hemisphere trade corporation" means a domestic corporation all of whose business is done in any country or countries in North, Central, or South America, or in the West Indies, or in Newfoundland and which satisfies the following conditions:

(a) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and

(b) If 90 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.

SEC. 26. CREDITS OF CORPORATIONS.

In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\* \* \* \* \* \* \*

(i) WESTERN HEMISPHERE TRADE CORPORATIONS.—In the case of a western hemisphere trade corporation (as defined in section 109)—

\* \* \* \* \* \*

(2) TAXABLE YEARS BEGINNING AFTER MARCH 31, 1951, AND BEFORE APRIL 1, 1954.— In the case of a taxable year beginning after March 31, 1951, and before April 1, 1954, an amount equal to 27 per centum of its normal-tax net income computed without regard to the credit provided in this subsection.

(3) TAXABLE YEARS BEGINNING AFTER MARCH 31, 1954.—In the case of a taxable year beginning after March 31, 1954, an amount equal to 30 per centum of its normal-tax net income computed without regard to the credit provided in this subsection.

I.R.C. 1954

SEC. 921. DEFINITION OF WESTERN HEMISPHERE TRADE CORPORATIONS.

For purposes of this subtitle, the term "Western Hemisphere trade corporation" means a domestic corporation all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies, and which satisfies the following conditions:

(1) if 95 percent or more of the gross income of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources without the United States; and

(2) if 90 percent or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.

For any taxable year beginning prior to January 1, 1954, the determination as to whether any corporation meets the requirements of section 109 of the Internal Revenue Code of 1939 shall be made as if this section had not been enacted and without inferences drawn from the fact that this section is not expressly made applicable with respect to taxable years beginning prior to January 1, 1954.

SEC. 922. SPECIAL DEDUCTION.

In the case of a Western Hemisphere trade corporation there shall be allowed as a deduction in computing taxable income an amount computed as follows—

(1) First determine the taxable income of such corporation computed without regard to this section.

(2) Then multiply the amount determined under paragraph (1) by the fraction—

(A) the numerator of which is 14 percent, and

(B) the denominator of which is that percentage which equals the sum of the normal tax rate and the surtax rate for the taxable year prescribed by section 11.

ness was done in Western Hemisphere countries, 95 per cent of its income was derived from sources outside the United States, and 90 per cent of its gross income was derived from the active conduct of a trade or business.

There is no contention that the petitioners did not derive at least 90 per cent of their gross income from the active conduct of a trade or business or that all of the business of Americas was not done in the Western Hemisphere countries. The principal controversy in both cases is over whether 95 per cent of each petitioner's gross income was derived from sources outside the United States. Practically all of the petitioners' gross income was derived from the purchase of goods in the United States and the resale of such goods to customers outside the United States, and the issue is whether the profit on these transactions was derived from sources outside the United States. A second issue involves the question whether interest received on deferred payment sales and fees or commissions received by the petitioners for sales promotional work carried on in their respective sales territories constituted income from sources outside the United States.

Section 454(f), *supra*, exempted certain described corporations from the Korean war excess profits tax. This section was derived from section 727(g) of the 1939 Code providing a similar exemption from the World War II excess profits tax. Section 109, *supra*, defining Western Hemisphere trade corporations, was incorporated in the 1939 Code by the Revenue Act of 1942. Section 921 of the 1954 Code continues this definition.

The purpose of this legislation was illustrated in S. Rept. No. 1631, 77th Cong., 2d Sess., 1942–2 C.B. 532, as follows:

American corporations trading in foreign countries within the Western Hemisphere are placed at a considerable competitive disadvantage with foreign corporations under the tax rates provided by the bill. To alleviate this competitive inequality, the committee bill relieves such corporations from surtax liability. * * *

Barber-Greene caused the organization of the petitioners in January 1952. It is apparent that a purpose of this organization was to secure the tax benefits of this legislation.

In 1945 the respondent considered the question whether the creation of a new domestic corporation to carry on the business in the Western Hemisphere outside the United States of an existing domestic corporation constituted tax avoidance within the meaning of section 129 of the Internal Revenue Code of 1939 where it was created for the purpose of gaining the tax benefits provided in this or similar legislation. Section 129 provided that if any person acquired control of a corporation for the principal purpose of evasion or avoidance of Federal income tax by securing the benefit of a credit or other allowance which

such person or corporation would not otherwise enjoy, then such credit or other allowance shall not be allowed. The respondent ruled in I.T. 3757, 1945 C.B. 200:

It appears from the structure of sections 109 and 727(g) of the Code, and the apparent purpose thereof, that Congress sought to make this relief available to any domestic corporation, provided only that it could satisfy the gross income and other specific requirements of those sections of the Code. The absence of any other restrictions or conditions relating to eligibility for such relief leads to the conclusion that the basic policy underlying those sections contemplates that they shall apply *to any domestic corporation which can, for a particular taxable year, satisfy such conditions as are specifically set forth therein without regard to the time of, or the occasion for, the organization of such corporation.* [Emphasis supplied.]

In view of the foregoing, it is held that the creation of a new domestic corporation to carry on the business in the Western Hemisphere (other than in the United States) of an existing domestic corporation *does not constitute tax avoidance within the meaning of section 129 of the Code, even though the new corporation was created for the principal purpose of gaining the benefits provided by the first exception in section 15(b) of the Code and by section 727(g) of the Code.* [Emphasis supplied.]

Section 119(e), I.R.C. 1939, provides that "Gains, profits and income derived from the purchase of personal property within and its sale without the United States * * * shall be treated as derived entirely from sources within the country in which sold." A similar provision is contained in section 862(a)(6) of the Internal Revenue Code of 1954.

The courts have consistently held, in interpreting the applicable statutes, that income from the sale of goods is derived from the actual sale, that this occurs when beneficial ownership and title passes to the purchaser, and that the situs of that event determines where the sale takes place. See *American Food Products Corporation,* 28 T.C. 14, 18 (1957), and cases there cited.

The petitioners, being aware of the interpretation of the courts that the place where title passes determines the source of the income from the sale, stipulated in all their proposals and all their sales contracts that they would retain title until arrival of the goods in a port outside the United States. The purchasers entered into these contracts with full knowledge of this stipulation. The petitioners arranged to have their agents in foreign countries endorse on the petitioners' account the documents necessary to effect transfer of title at the destination.

The respondent contends that the sales transactions of the petitioners were arranged in the manner described for the primary purpose of tax avoidance, that because of this the sale should be treated as consummated at the place where the substance of the sale occurred, that the substance of the sale occurred in the United States, and that

the arrangement whereby passage of title was delayed was a formality designed to avoid taxes.

The respondent says that, in substance, the sales were completed when all the petitioners' obligations with respect to handling of the equipment sold were performed; that this was done in the United States; that a vendor may transfer the *property* in the goods and still retain *title* for a special reason, such as for securing payment, hence retention of title for the special purpose of tax avoidance does not prevent passage of the *general property* in the goods under the law of sales, and that the essential element in a sale is the passage of *beneficial ownership* in the goods which may occur without the technical passage of title.

Another argument made by the respondent relates to the practice of using irrevocable letters of credit drawn on a United States bank. The contention is that under this arrangement, the petitioners did not have the duty to deliver the equipment to the foreign port of entry before becoming entitled to the invoice price. The argument goes on that petitioners were required to deliver only documents evidencing the loading of the equipment on a vessel for shipment to the foreign port. Hence, the last act required of them to effect performance was done in the United States and that is where the income was derived. At that point they were assured of the price, including the profit or income from the sale. All that remained to be done was presentation of shipping documents to the United States bank.

The respondent argues further that the petitioners were not licensed to do business in any foreign country, had no statutory agent for service of legal papers in any such country, did not pay foreign income taxes, and had no manufacturing facilities, offices, warehouses, or assets outside the United States, that their foreign activities were minimal, and that they should not be regarded as deriving income from the active conduct of trade or business in foreign countries, with the risks or hazards that such foreign business activities entail.

The case of *United States* v. *Balanovski*, 236 F. 2d 298 (C.A. 2, 1956) involved purchases made in the United States by Argentine buyers. These were held taxable as transfers of title in the United States. In that case the Court of Appeals stated:

a nonresident alien engaged in business here derives income from the sale of personal property in "the country in which [the goods are] sold." By the overwhelming weight of authority, goods are deemed "sold" within the statutory meaning when the seller performs the last act demanded of him to transfer ownership, and title passes to the buyer. * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Although the "passage of title" rule may be subject to criticism on the grounds that it may impose inequitable tax burdens upon taxpayers engaged in substantially similar transactions, such as upon exporters whose customers require that

property in the goods pass in the United States * * * no suitable substitute test providing an adequate degree of certainty for taxpayers has been proposed. Vague "contacts" or "substance of the transaction" criteria would make it more difficult for corporations engaged in Western Hemisphere trade to plan their operations so as to receive the special deduction granted them if they derive at least 95 per cent of their income from sources outside the United States. * * *

*       *       *       *       *       *       *

Of course this test may present problems, as where passage of title is formally delayed to avoid taxes. Hence it is not necessary, nor is it desirable, to require rigid adherence to this test under all circumstances. But the rule does provide for a certainty and ease of application desirable in international trade. Where, as here, it appears to accord with the economic realities (since these profits flowed from transactions engineered in major part within the United States), we see no reason to depart from it. * * *

The respondent argues that this opinion condemns formal delay in the passage of title to avoid taxes and that this is what the petitioners are doing.

The petitioners concede that their sales procedures were established and arranged in the manner adopted with the intention to qualify for the tax benefits granted by the cited statutes to domestic corporations deriving their gross income from sources without the United States. They point out that the opinion quoted from the *Balanovski* case, indicates that corporations engaging in Western Hemisphere trade are entitled to "plan their operations so as to receive the special deduction" granted such corporations.

When the Congress offered certain tax benefits as an inducement to United States corporations to engage in foreign trade, it was to be expected that some corporations would seek to avail themselves of these benefits. The creation of a subsidiary to carry on the business in the Western Hemisphere area of an existing domestic corporation does not constitute tax avoidance within the meaning of sec. 129 (as held in I.T. 3757, *supra*), and there seems to be no good reason why the deliberate organizing of such a corporation's business and sales procedures to meet the other conditions specified by the legislation and thereby to qualify for the tax benefits offered should be regarded as tax avoidance. Otherwise the purpose of organizing the subsidiary would be lost and the congressional objective would not be carried out.

It has repeatedly been stated that taxpayers have the right so to arrange their affairs that their taxes shall be as low as possible, *Gregory* v. *Helvering*, 293 U.S. 465 (1935); that one is not obliged to pursue a course of action giving rise to a greater tax liability if another is open which will give rise to a lesser liability, *Fruit Belt Telephone Co.*, 22 B.T.A. 440 (1931), acq. X–2 C.B. 25, and that what a taxpayer did, rather than what he might have done, determines his liability. *Seminole Flavor Co.*, 4 T.C. 1215, 1230 (1945). See also

*United States* v. *Cumberland Public Service Co.*, 338 U.S. 451 (1950). The petitioners could have agreed to a form of "shipment contract" under which title passes from the seller when the goods are placed on board a carrier for delivery to the buyer. Instead, they chose a form of contract known as a "destination contract" under which title passes at a terminal point in transit.

The dealers' contracts provided that they were to be construed under the laws of the State of Illinois. Illinois has adopted the Uniform Sales Act and it is presently codified in Illinois Revised Statutes, ch. 121½, secs. 1–77 (1953). This statute provides:

SEC. 18

PROPERTY IN SPECIFIC GOODS PASSES WHEN PARTIES SO INTEND. (1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.

(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case.

*   *   *   *   *   *   *

SEC. 20

RESERVATION OF RIGHT OF POSSESSION OR PROPERTY WHEN GOODS ARE SHIPPED. (1) Where there is a contract to sell specific goods, or where goods are subsequently appropriated to the contract, the seller may by the terms of the contract or appropriation, reserve the right of possession or property in the goods until certain conditions have been fulfilled. The right of possession or property may be thus reserved notwithstanding the delivery of the goods to the buyer or to a carrier or other bailee for the purpose of transmission to the buyer.

Under these provisions of law and under the contracts effected by the petitioners, it was agreed that title was to remain in the petitioners until arrival of the goods at a foreign destination. This was not a retention of a "security title" or "special title" for security purposes as the petitioners made other arrangements for collecting the sales price.

The legislation involved imposes no requirement that a corporation, to be entitled to its benefits, must maintain a foreign warehouse or factory or pay foreign taxes. The petitioners had foreign dealers making sales of their products and traveling agents assisting them, and shared advertising expenses with their dealers. The reality and substance of the petitioners' transactions is that the goods sold were for use in foreign places and the funds to pay for the goods were derived from foreign places.

The real issue is whether the petitioners' retention of title was a sham. In retaining ownership they undertook real responsibilities, risks, and obligations, quite at variance with those involved in the case of sales where title would pass in the United States. A contract to

deliver in Chile by a certain date a machine built in the United States is more burdensome than a contract to deliver such a machine to a dock in New York by a certain date. The petitioners assumed the risk of delays in transit or loss or damage en route, the responsibility of engaging freight forwarders and of arranging many other details. They could and did protect themselves to some extent by insurance against losses in transit, but if the insurer would not or could not pay, the loss would be that of the petitioners. It is their right to elect whether to avoid these risks or to undertake such risks and qualify for the tax benefits offered by the Congress. Their retention of title was real and we find that under their contracts title passed in foreign places and their income from such sales was from outside the United States.

The respondent cites *Ardbern Co., Ltd.*, 41 B.T.A. 910 (1940), modified on another issue 120 F. 2d 424 (C.A. 4, 1941). Ardbern was a Newfoundland corporation formed by B. T. Feustman as his personal holding corporation. It held certain shares of stock. Feustman agreed to a sale of these shares, endorsed the certificates in blank, and delivered them to an agent of the purchasers in New York. This agent took these certificates and others to Montreal and delivered them to a bank where the purchasers had deposited funds and Ardbern was credited by the bank with the price. In determining whether sale was made in New York or Montreal we stated:

"It is well established that title to property passes at the place of sale where the final act of the seller making effective the sale takes place." *Hazleton Corporation*, 36 B.T.A. 908, 923, and authorities cited. When Feustman, as president of petitioner corporation, endorsed the stock certificates in blank and delivered them to the agent of the purchasers in New York, *it not being shown that it was intended that title thereto should pass at some other time or place*, nothing further remained to be done by the seller, petitioner herein, to make the sale effective in accordance with Feustman's agreement. Petitioner was thereupon entitled to receive the consideration agreed upon. There is nothing in the record to indicate *that Feustman had agreed that the sale should be consummated in Canada*, or that the transaction there was at his request or for the benefit of his company. * * * [Emphasis supplied.]

* * * In the *Hazleton* case, while the taxpayer corporation negotiated the sale of its stock to the bankers in San Francisco, *it was clearly understood that the sale was to take place in Canada and not in the United States. The agreement to sell was specifically predicated upon that condition.* The stock certificates were then in Canada, on deposit with the Bank of Montreal. The bankers appointed the Royal Trust Co. of Montreal their agent for the purchase of the stock. On the facts presented, *we reached the conclusion that the sale was consummated in Canada for the reason that it was the intention of all parties concerned that the seller should part with its title in the stock by delivery of the shares to the Royal Trust Co. in Montreal.* No such facts appear in the instant case. [Emphasis supplied.]

The respondent also cites *Ronrico Corporation*, 44 B.T.A. 1130 (1941). This taxpayer was a Puerto Rican corporation which effected an agreement to sell rum to a United States corporation to be delivered at Atlantic or Gulf ports, the price to include freight and insurance prepaid by the seller. The shipments were made by common carriers from San Juan to United States ports designated by the purchaser. In determining where the sales took place we held the sale was consummated when the goods were delivered to the carrier and the shipping documents forwarded to the purchaser. We said, in part (p. 1135–1136):

The bills of lading and insurance policies in all save two of the sales here in question, unlike those in the strict c.i.f. transaction, were made out in the name of the shipper or to his order, thereby leaving in him, after shipment, title to the goods which otherwise would have passed then. Strictly considered, therefore, title to petitioner's rum did not pass in these transactions until the delivery of the bills of lading to the buyer in the United States. It is well recognized that where this method of dealing is followed only for the purpose of giving some security to the seller, it does not prevent the passage of beneficial ownership and risk in the goods to the buyer at the point of shipment. [Citing authorities.] In the present case the agreements provided for c.i.f. sales. The documents were discounted, forwarded and paid by the purchaser, usually before the arrival of the goods. *These circumstances indicate that the parties did not intend to accomplish a sale of the goods at the point of destination.* The ownership was the purchaser's from and after the time of shipment and payment was made, not at the time of the arrival of the goods but earlier, when the documents were received. [Citing authorities.] [Emphasis supplied.]

Considering these facts it must be concluded that *the parties did not intend*, by taking the documents in the shipper's name, to change the time when ownership customarily passes, and accordingly the conclusion which we have reached above is not altered. [Emphasis supplied.]

In the *Ardbern* and *Ronrico* cases, *supra*, the problem was to ascertain the *intent* of the parties as to passage of title where the agreements did not show that intent. It became necessary for the Board to examine the surrounding facts to determine that intent. In the present cases the intention of the parties is clearly stated in their contracts and resort to other evidence is not necessary.

The case of *Kaspare Cohn Co. Ltd.*, 35 B.T.A. 646 (1937), also cited by the respondent, involved a United States corporation which agreed to sell securities to United States buyers and formed a Canadian subsidiary for the sole purpose of effecting the sale outside the United States. We held that the Canadian corporation should be ignored as a sham and we found it unnecessary to decide whether the sale was made in Canada or the United States. In that case the securities and the parties were not Canadian and Canada had no relation to the case. We found the situation exceptional.

The petitioners having agreed with their buyers that title would be

retained until the goods reached a foreign port, it is immaterial that in some instances payment was made prior to the arrival of the goods in a foreign port or that the goods were delivered to a carrier or other bailee or to the buyer prior to arrival at the foreign destination. See section 20, chapter 121½, Revised Statutes of Illinois, quoted above. The agreements are controlling and the income thereunder was from outside the United States.

The respondent contends that certain income reported by Americas as commissions has not been proved to be from sources outside the United States. These amounts represented 5 per cent of the list price of equipment sold by Barber-Greene Olding Company, Ltd. Olding is an English corporation with manufacturing facilities in England in which Barber-Greene Company owned a 51 per cent interest. Olding had no sales agents in the Western Hemisphere countries. Some sales made by Americas' agents or dealers occurred in countries where there was a shortage in dollars and money was available in pounds sterling, or where an English make of machine would be specified. In these cases the order would be filled by Olding and Americas would be allowed a commission for the sales effort which resulted in the sale. The sales resulted from Americas' dealer organization, its traveling representatives, and its advertising. While the commissions were paid, not by Olding, but by Barber-Greene Company, the latter was acting only as disbursing agent for Olding and was not the source of the payment. We are satisfied from the evidence that this income was clearly from sources outside the United States. *British Timken Limited*, 12 T.C. 880 (1949), acq. 1949–2 C.B. 1; Rev. Rul. 60–55, 1960–1 C.B. 270; sec. 862, I.R.C. 1954.

The respondent argues in the alternative, that Americas failed properly to report its true gross income and it is therefore not possible to determine whether it meets the statutory requirements. This argument is based upon the contention that Americas failed to report the income from a sale in 1954 to the Brazilian State highway maintenance department, and the respondent infers that other such transactions occurred resulting in income which Americas did not report.

This point has not been raised in the deficiency notice nor in respondent's answer to the petition and is not properly before us. If this contention is to be considered, the burden is upon the respondent to show the fact and amount of the alleged understatement of income.

Furthermore, as the petitioners explain, the facts of this particular sale show that it was made not by Americas, but by Barber-Greene Company. The conditions of the sale were not acceptable to Americas, and the purchaser was informed that the order should be made out to Barber-Greene Company, the order was handled by the parent, and

the machine was shipped by the parent to the purchaser. Some confusion resulted when the purchaser's agents did not observe the distinction between Americas and the parent company. For example, correspondence addressed to Americas expressed a desire to purchase equipment "manufactured by you," whereas Americas did no manufacturing. The purchaser secured a letter of credit in favor of Americas and rather than trouble the purchaser to cancel this and secure a new one Americas accepted the payment and transferred the funds to Barber-Greene. The profit on the sale was reported by the parent company. The equipment was never owned by Americas and there was no income to Americas from this transaction.

The respondent contends, in the alternative, that even if the income from petitioners' sales under most of these contracts was from outside the United States, there were certain sales made by Americas which were not carried out under this procedure and that income from these sales was from United States sources and exceeded 5 per cent of Americas' gross income for certain years, hence Americas did not qualify as a Western Hemisphere trade corporation in those years.

One of these involved the sale of two asphalt-mixing plants to the Ministry of Public Works in Uruguay in 1952. The facts concerning this transaction are stated in our Findings of Fact. The respondent contends that under these facts title, control, and possession of the goods did not remain in Americas until they reached a foreign port, that the United States bank acquired possession of the shipping documents and Americas received payment from the bank in June 1952 while the vessel did not arrive in Uruguay until July 8, hence the documents must have been in the possession of the buyer before that date and Americas would have received the full invoice price once the equipment was loaded for shipment even if it had never arrived in Uruguay. The respondent further argues that the insurance, at 110 per cent of the invoice price, was obtained from the point of view of the purchaser who must pay whether or not the goods arrive.

This sale originated with Americas' dealer in Montevideo and the letter quoting prices to the Uruguayan engineers representing the Ministry stipulated for retention of title until the equipment reached Uruguay. The bill of lading was made to the order of Americas in Montevideo and was sent to Uruguay for endorsement by Americas' agent. Insurance provided for loss payable to Americas. The invoice contained a provision for retention of title and the negotiable bill of lading was endorsed and delivered in Uruguay by Americas' transfer agent.

As the petitioner points out, the mere opening of a letter of credit does not entitle the seller to payment but merely guarantees that

payment will be made if the sale is completed. Also the time of payment does not fix the place of sale. If the buyer has performed its part, there remains the duty of the seller to deliver according to the agreement and title does not pass with payment unless it is so agreed. If the goods were never delivered Americas could not have retained any of the purchase price. Under this particular contract 15 per cent of the price was retained until the plants were installed and erected and final payment was not made until over 6 months after arrival of the goods in Uruguay. The insurance covered Americas until arrival of the property in Uruguay and continued for the benefit of the buyer thereafter until the inland destination was reached. An engineer for Americas supervised the installation of the plants as a part of the sales agreement. This sale clearly took place outside the United States.

The respondent also contends that a certain sale of roadbuilding equipment in 1955 for use in a roadbuilding contract in Bolivia occurred in the United States. One point made is that a cash discount of 2 per cent was available to the buyer if payment was made within 10 days from receipt of notice from Bolivia that the shipping documents sent to Bolivia had been endorsed over to the buyer. The time or manner of payment is not controlling on the question of passage of title where the parties have otherwise agreed upon that matter. Another point made is that when there was a claim for loss or damage made against the insurer, the buyer, not Americas, processed the claim, paid for the repairs, and waited nearly 2 years before collecting on the insurance claim. Americas filed a formal claim with the insurer and, as the named insured, released its interest in the claim in favor of the buyer. Whether the loss occurred before or after arrival of the goods in South America was not ascertained. If title had passed in the United States, Americas would have no occasion to file the claim and no interest to release. There is nothing in this state of facts to contradict the agreement of the parties as to passing of title outside the United States.

The respondent argues that certain other specific sales were handled in such a manner that title must have passed in the United States. The amounts of income derived from these sales are not sufficient to disqualify the seller under the 95 per cent requirement, even if they were construed as having been made outside the United States. Under our interpretation of these contracts generally we find no basis for construing these particular sales in accordance with the respondent's argument, hence we have made no findings of fact concerning them individually.

Accordingly the issue is resolved in favor of the petitioners.

*Decisions will be entered for the petitioners.*