Pfaudler Inter-American Corporation v. Commissioner.
Pfaudler Inter-American Corp. v. Commissioner
Docket Nos. 87217, 89086.
United States Tax Court
T.C. Memo 1963-109; 1963 Tax Ct. Memo LEXIS 233; 22 T.C.M. (CCH) 506; T.C.M. (RIA) 63109; April 17, 1963
*233 Held, that petitioner qualifies for all taxable periods involved, as a Western Hemisphere trade corporation within the meaning of section 109 of the 1939 Code and section 921 of the 1954 Code; and that as such, it is entitled to the credits and special deductions provided for Western Hemisphere trade corporations, and also is exempt from excess profits tax for the first taxable period involved, under section 454(f) of the 1939 Code. Principles of Barber-Green Americas, Inc., 35 T.C. 365, and other cases herein cited, applied. Scott Stewart, Jr., Esq., 31 Exchange St., Rochester, N. Y., and John C. Reid, Esq., for the petitioner. Charles M. Greenspan, Esq., and Cornelius C. Shields, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in income taxes against the petitioner, as follows: Dkt. No.
Deficiency
87217
Fiscal year ended:
May 31, 1954
$40,347.75
May 31, 1955
45,855.41
May 31, 1956
39,230.01
May 31, 1957
37,717.77
Period from June 1, 1957
to December 31, 1957
3,254.55
89086
Calendar year 1958
11,970.75
The issue for decision is whether in the circumstances here present, the petitioner qualifies for each of the taxable *235 periods involved, as a Western Hemisphere trade corporation within the meaning of section 109 of the Internal Revenue Code of 1939 and section 921 of the Internal Revenue Code of 1954. If petitioner does so qualify, it will be exempt from excess profits tax for the first of said periods, pursuant to section 454(f) of the 1939 Code, and also will be entitled for all of said periods, to the credits and special deductions provided by section 26(i) of the 1939 Code and section 922 of the 1954 Code. Findings of Fact Some of the facts have been stipulated. All stipulations of facts and the exhibits thereto attached are incorporated herein by reference. The petitioner, Pfaudler Inter-American Corporation, is a New York corporation which was organized on April 23, 1953. Its income tax return for each of the taxable periods involved was filed with the district director of internal revenue at Buffalo, New York. At all times since its organization, petitioner has been a whollyowned subsidiary of The Pfaudler Company (renamed Pfaudler Permutit Inc. on October 1, 1957). The Pfaudler Company (herein called the "Parent") was organized under the laws of the State of *236 New York in 1884. Its office and principal place of business are located in Rochester, New York. Its principal business is that of manufacturing and selling glass-lined and stainless steel tanks, brewhouse equipment, and various accessories for breweries, dairies, chemical plants, and other industries. For several years prior to 1953, a substantial portion of its sales were for delivery to customers located within the Western Hemisphere but outside the United States. In 1953, the officers and directors of said Parent determined that it would be advantageous "both from a financial standpoint and from the standpoint of creating good will among our customers in these Western Hemisphere countries to have sales to such customers handled by a separate corporation which would qualify as a Western Hemisphere Trade Corporation under Section 109 of the Internal Revenue Code." Accordingly and for such purpose, the petitioner corporation was organized as a wholly-owned subsidiary of the Parent, on said date of April 23, 1953. Upon organization and also throughout all the taxable years involved, petitioner had capital stock of $10,000, represented by 200 shares of common *237 stock without par value, all held by the Parent. Its office and principal place of business have at all times been located at the same address as that of the Parent, 1000 West Avenue, Rochester, New York. Shortly after petitioner's organization, it and the Parent entered into a preliminary letter-agreement regarding their proposed relationship; and thereafter this relationship was more specifically defined in a written agreement executed under date of August 27, 1953, but made effective as of June 1, 1953. The principal provisions of this latter agreement included, in substance, the following: Parent granted to petitioner: (a) The exclusive right as principal, to sell the products of the Parent to customers located in the countries of North, Central, and South America, exclusive of the United States, and also in the West Indies and Newfoundland; (b) the right to enter into exclusive sales-representation agreements with the Parent's then representatives in said countries, and also the right to appoint such other representatives as petitioner might deem advisable; and (c) the right to use the Parent's name, and also its trademark or trade name, in connection with sales of the Parent's *238 products in said countries. Parent agreed that it would transfer to petitioner, by mutual arrangement, its unfilled orders from customers located in the above-designated foreign countries, which were on its books on June 1, 1953; it being understood however, that petitioner might renegotiate with the customers any new terms and conditions of sale that it and the customers might agree upon. Parent agreed that it would use its best efforts to fill all orders which it might receive from petitioner, for such of its products as were to be delivered to petitioner's customers in the designated countries. Shipment of the products would be made as promptly as possible, but without liability in Parent for delays arising from situations beyond its control. Legal title and right to possession of the products would pass from Parent to petitioner at the time of shipment from Parent's factory or warehouse. And Parent agreed that it would repair or replace, at its option, any of the products which the eventual purchaser might find to be defective. It was mutually agreed that the price to be paid by petitioner to the Parent for all such products would be, exclusive of any sales taxes or excise *239 taxes that might be found to be payable, an amount equal to the Parent's estimated factory cost of manufacture, plus certain percentages of such cost as specified in the agreement, that varied according to the particular type of product involved. Parent agreed that if any of its products were sold by petitioner under a contract requiring installation of the same, it would make available to petitioner for fees to be agreed upon, erecting engineers to supervise such installation. Parent agreed that upon request of petitioner, it would investigate and report the credit rating of any customer of petitioner. It was further agreed that Parent would make available to petitioner (in their common offices in Rochester) such office space and also such clerical and administrative services as might from time to time be necessary in connection with the petitioner's normal business operations. And, as consideration for such services and facilities, and also for any other miscellaneous administrative expenses of Parent that were applicable to petitioner's sales, petitioner agreed that it would pay Parent in addition to the above-mentioned prices for products ordered, a fee equal to 5 percent *240 of the estimated factory cost of all equipment sold under the agreement. During all the taxable periods involved, petitioner sold to customers located in the above-designated foreign countries, products which it purchased exclusively from Parent. The manner in which it operated during said years, and in which it handled such sales, was as follows. Petitioner did not have or maintain outside the United States, any stock of goods, or any office, warehouse, or other permanent place of business. It did not register to do business in any country outside the United States; did not pay any income tax to any foreign country; and did not make any payment to any foreign government for any sales taxes or use taxes. Also, petitioner had no officers or employees who were located in or who regularly worked or traveled outside the United States, except for one full-time salesman who was employed in Canada after June 1, 1957. All of petitioner's accounting, credit and billing functions were handled in the United States; and all its various sales documents were prepared in the United States. Petitioner did have arrangements with independent sales representatives located in certain of the designated *241 foreign countries, who solicited orders for petitioner and then forwarded such orders to petitioner's office in Rochester, New York. These representatives also did similar work for other concerns. They were not on petitioner's payroll, but they were paid commissions by petitioner, upon completion of the transactions which they initiated. Petitioner also had arrangements with a "freight forwarder" in New York City, and with various "endorsing agents" located in certain of the designated foreign countries to which it shipped goods. The principal function of these "endorsing agents," as hereinafter more fully shown, was to endorse and deliver to petitioner's customers on its behalf, the bills of lading and transit insurance certificates pertaining to goods shipped, after the goods had arrived at their destination. In some cases, petitioner's independent "sales representative" acted also as the "endorsing agent." And in other cases, a foreign branch of the National City Bank of New York acted as the endorsing agent. Whenever petitioner received at its Rochester office an inquiry from a potential foreign customer regarding a particular piece of equipment, its usual practice was to send *242 such customer a "Proposal" on a standard printed form. This proposal would set forth the specifications and price of the equipment covered by the inquiry, the delivery and payment terms, and also various conditions of sale. Included among these conditions of sale was the following paragraph: 2. Irrespective of the time, method, place or medium of payment, the method of shipping, the form of shipping documents, or the place of acceptance of this proposal, legal title to, the benefit of possession of and control over, and risk of loss of or damage to the merchandise covered hereby shall remain with the Company until actual arrival of such merchandise at the Port of Entry (or other point of destination named in this proposal) outside of the United States of America. Thereafter, if the potential customer found petitioner's "Proposal" to be satisfactory, it would order the equipment by signing a copy of the "Proposal" and returning the same to petitioner in Rochester. Occasionally however, where a customer was repeating a previous order, it would send the new [to petitioner on its own purchase order form; and in such cases, no "Proposal" would be issued. Upon petitioner's receipt *243 in Rochester, either of the customer's executed copy of the "Proposal" or of the customer's own purchase order, it would after acceptance of the same, send the customer a notice of acceptance on a standard form. This acceptance form likewise would set forth specifications and price of the equipment, and also a statement that the order was "subject to the terms and conditions printed on the back hereof" - which included a title retention paragraph that was substantially the same as that above quoted from petitioner's "Proposal" form. The price quoted both in the proposal and acceptance forms was a base price plus transportation and insurance charges (subsequently to be determined) to the point of destination. During the taxable years, the largest amount of petitioner's sales, as hereinafter shown, was to members of the brewing industry. The terms for payment by customers varied, but the general pattern was as follows: Brewery equipment 25% with order 25% with start of manufacture 50% sight draft vs shipping documents; or 25% sight draft vs documents with balance upon completion of installation Other than brewery equipment (a) Canada - Net 30 days from date of shipment
*244 (b) Mexico and overseas (1) Value up to $2,500 - sight draft vs documents (2) Value of $2,500 to $5,000 - 10% with order, balance sight draft vs documents (3) Value of $5,000 and over - 25% with order, balance sight draft vs documents Payments in advance of delivery were made to petitioner in the United States; and payments on sight draft were normally handled through banking channels. After a sales contract between petitioner and a foreign customer had been so effected, petitioner would order from Parent the equipment to be delivered under such contract. After Parent had completed manufacture of the equipment or otherwise had the same ready for delivery, petitioner would take title thereto upon shipment from Parent's factory or warehouse. The price which petitioner in each case would pay Parent for the equipment would be in accordance with the above-mentioned agreement between these parties, i.e.: Parent's cost of manufacture, plus the above-mentioned additional specified percentage thereof. In cases where the equipment was shipped to customers overseas i.e., to one of the above-designated countries other than Canada or Mexico), the equipment was first shipped directly *245 from the Parent's plant to the "freight forwarder" located in New York City. The Parent initially paid the inland freight to New York City, and then billed petitioner for the same. Thereafter, the New York freight forwarder, acting pursuant to instructions of petitioner, would: Arrange for ocean shipping space, and also for insurance to the point of destination; draw an ocean bill of lading, under which the goods were consigned to petitioner at the point of foreign destination; complete the invoice supplied to him by petitioner, by adding to the base price shown thereon, the amounts of the ocean freight and insurance charges as determined by him; and then forward all the shipping documents (including the invoice, the original unendorsed order bill of lading, and the original unendorsed insurance certificate) to petitioner's designated "endorsing agent" in the destination country. This freight forwarder also would pay the amounts of the ocean freight; send notification of the shipment both to the foreign customer and to petitioner; and bill petitioner for the amounts of the ocean freight, the insurance, and its other charges. Thereafter when the goods arrived at the foreign port of *246 destination, the "endorsing agent" located in that country would endorse and deliver to the foreign customer in accordance with petitioner's instructions, both the bill of lading and the insurance certificate; and he then would return to petitioner, a copy of the invoice together with a statement of the date on which said instruments had been so endorsed and delivered. In cases where the equipment was shipped to customers in Mexico, the procedures were similar, except that the equipment would be sent by rail, directly from Parent's plant to a "customs-house broker" at the Mexican border. This broker then handled the further shipment from the Mexican border to a Mexican "endorsing agent" in Mexico, consigned to the petitioner; and thereafter such agent would handle the endorsing and delivery of the bill of lading and other shipping documents to the customer. In cases where the equipment was shipped to Canadian customers (which shipments, as hereinafter shown, represented the largest portion of petitioner's sales for all taxable periods involved), the procedure was this. The goods were shipped by rail directly from Parent's plant to the Canadian destination point, on a straight bill *247 of lading consigned to petitioner, on which the customer itself was designated as party who was to be advised by the carrier upon the goods' arrival. Petitioner then supplied such Canadian customer with a delivery order addressed to the carrier, under which the customer was authorized to obtain release of the goods to itself upon their arrival at the destination. Payments for Canadian shipments were normally made in the manner hereinbefore stated. As regards the insurance on ocean shipments, this was usually handled under a blanket policy which petitioner had with the Phoenix Insurance Company of Hartford, Connecticut. This blanket policy named petitioner as the insured, "For Account Of Whom It May Concern"; and it also contained a clause, known as a warehouse-to-warehouse clause, which provided insofar as here material, that: This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the Policy for the commencement of the transit and continues * * * until * * * [the goods are] delivered to final warehouse at the destination named in the Policy * * *. As each individual shipment was made, a separate insurance certificate therefor *248 would be issued in petitioner's name as the insured, by the manager of the insurance company in New York - after the particular goods had arrived in New York and after the freight forwarder had supplied the insurance company with information as to the value of the shipment and the amount of the ocean freight therefor. The freight forwarder would in each case, pay the premium applicable to the particular shipment, and would then bill petitioner for the amount so paid. On Mexican rail shipments, the petitioner itself made out the insurance certificate; and it then sent a copy of the same to the insurance company which thereafter billed petitioner for all accumulated certificates, on a monthly basis. On Canadian shipments, petitioner used no insurance, but relied solely on its ability to obtain adjustment from the rail carrier for any damage or loss. In the event goods were damaged or lost in transit, petitioner either credited the amount of the ascertained damage to the customer's account, or bore the cost or repairs or replacement of the damaged parts; and it then filed claims with its insurance company or with the rail carrier, as the case might be. In several instances where the *249 Parent was handling the repairs, it filed the claims on petitioner's behalf, and then received the proceeds for its own account. The amounts of petitioner's sales during the taxable periods involved, as broken down among countries to which the products were shipped, were as follows: British
West
Puerto
Canada
Cuba
Indies
Mexico
Panama
Rico
Total
Year ended May 31: 1954
$ 906,812
$140,210
$215,547
$ 38,131
$1,300,701
1955
1,160,625
$ 1,471
273,561
$471,289
60,839
1,967,785
1956
867,675
316,582
255,372
66,716
24,170
1,530,514
1957
1,154,273
383,102
195,029
21,520
19,729
1,773,653
Period of June 1 to Dec. 31,
1957
297,757
1,699
33,734
330,190
Year ended Dec. 31, 1958
471,982
15,684
395,878
10,190
115,734
1,009,468
The methods used by petitioner in recording its sales transactions in its books of account, were as follows: From the time of its organization on April 23, 1953, through January 31, 1956, petitioner separately recorded each sale as having been made on the date when the "endorsing agent" endorsed and delivered the shipping documents to the customer. However, *250 on and after February 1, 1956, its practice was to accumulate its several sales invoices for each month, and then enter the total of the same as a single item at the end of such month. Also, until the above date of January 31, 1956, petitioner's practice was to include goods purchased from Parent in its inventory as of the date of their purchases; and later, when the sale of goods to a customer was recorded as above shown, the item would be taken out of inventory and recorded as cost of goods sold. However, commencing on February 1, 1956, goods purchased from Parent were not recorded in inventory until the end of the year of such purchase; and if at that time there were any shipments for which notification of endorsement to the customer had not been received, the same were placed in an in-transit inventory. Petitioner, in its income tax return for each of the taxable periods here involved, treated itself as having qualified as a Western Hemisphere trade corporation; and it computed its income tax accordingly. The respondent however, in his notices of deficiency which are here involved, determined that petitioner did not qualify as a Western Hemisphere trade corporation, and that *251 therefore it was subject to the taxes imposed by section 15 of the 1939 Code and section 11 of the 1954 Code. Accordingly, he then determined the deficiencies in tax which are here involved. Opinion The issue herein, as before stated, is whether the petitioner for each of the taxable periods involved, qualifies as a Western Hemisphere trade corporation within the meaning of section 109 of the 1939 Code and section 921 of the 1954 Code. In order to so qualify, petitioner must show that all its business was done in Western Hemisphere countries; that 95 percent or more of its gross income was derived from sources other than sources within the United States; and that 90 percent or more of its gross income was derived from the active conduct of a trade or business. If it meets these requirements, it will be entitled to the credits and special deductions provided for Western Hemisphere trade corporations; and it also will be exempt from excess profits tax for the first taxable period involved, under section 454(f) of the 1939 Code. The respondent, in support of his determinations that petitioner *252 does not so qualify, has advanced several contentions. Principal among these contentions are the following: 1. That no substantial part of the petitioner's operations were conducted outside the United States, within Western Hemisphere countries - because, except for one salesman in Canada, it had no employed personnel located, stationed or regularly traveling in any Latin American country; it maintained no offices or warehouses outside the United States; and hence, even apart from questions of sources of income, its operations did not fall within the purpose and intent of the above-mentioned statutes. 2. That with respect to sources of income, the substantial and significant factors of petitioner's sales transactions occurred in the United States; that its retention of title to its goods until the same reached their respective foreign destinations, was solely for the purpose of avoiding United States taxes and not for any business purpose; and that in determining the source of petitioner's income, the so-called "substance of the sale test" rather than the "passage of title test," should be applied. Both this Court and others have, in several cases involving facts and issues similar *253 to those involved in the instant facts and issues similar to those involved in the instant case, considered and rejected contentions made by the respondent therein, which were substantially the same as those that he here advances. Barber-Green Americas, Inc., 35 T.C. 365 (1960); Pan American Eutectic Welding Alloys Co., 36 T.C. 284 (1961); A. P. Green Export Co. v. United States, 284 F. 2d 383 (Ct. Cls. 1960); Frank v. International Canadian Corporation, 308 F. 2d 520 (C.A. 9, 1962), affirming unreported decision (W.D. Wash.). In the above cases, the several courts considered and reviewed the purpose and intent of the controlling statutes as indicated by their terms and legislative history; administrative rulings with respect to said statutes; and numerous judicial authorities. Notwithstanding that the facts in said cases differ somewhat from the facts of the present case, we regard these differences to be not substantial. See also in this connection. United States v. Balanovski, 236 F. 2d 298 (C.A. 2, 1956). Based on the principles of the abovecited cases, as applied to all the evidence in the instant case, *254 we hold that title to all goods sold by petitioner during the taxable periods involved, passed to the customers outside the United States and within the respective Western Hemisphere countries in which such customers were located; that petitioner's income from such sales was derived from sources outside the United States, but within Western Hemisphere countries; and that petitioner qualifies, for all taxable periods here involved, as a Western Hemisphere trade corporation within the meaning of the above-mentioned controlling statutes. It follows that respondent erred in disallowing to petitioner, the credits and special deductions allowable to Western Hemisphere corporations; and that he erred also in disallowing to petitioner exemption from excess profits tax for the first taxable period here involved. Decisions will be entered under Rule 50.