Babson Bros. Export Co. v. Commissioner.
Babson Bros. Export Co. v. Commissioner
Docket No. 81046.
United States Tax Court
T.C. Memo 1963-144; 1963 Tax Ct. Memo LEXIS 201; 22 T.C.M. (CCH) 677; T.C.M. (RIA) 63144; May 24, 1963
*201 Petitioner was organized to buy and sell dairy farm equipment as a Western Hemisphere trade corporation. During the years in question, petitioner purchased dairy farm equipment exclusively from Babson Bros. Co. and related companies in the midwestern United States and sold it exclusively to customers located outside the United States and within Canada, Central and South America and the West Indies. Petitioner assumed the risk of loss and retained title to its merchandise until the goods reached their foreign destination. Petitioner was not licensed to do business in any foreign countries within the Western Hemisphere, did not maintain an office, have any property, real or personal (other than merchandise in transit), or actually have any employees regularly engaged in conducting its affairs outside the United States. During the taxable years in question, petitioner never had more than one employee on its payroll. Many of petitioner's sales activities were carried on by employees of Babson Bros. Co., petitioner's parent. Held: Petitioner qualified as a Western Hemisphere trade corporation under section 109, 1939 Code and section 921, 1954 Code. (1) In order to qualify as a Western *202 Hemisphere trade corporation, it is not necessary that the taxpayer be present and carrying on an active trade or business "in foreign countries within the Western Hemisphere." Barber-Greene Americas, 35 T.C. 365 (1960); A. P. Green Export Company v. United States, 284 F. 2d 383 (Ct. Cl. 1960); and Pan American Eutectic Welding Alloys Co., 36 T.C. 284 (1961), followed. (2) 90 percent or more of petitioner's gross income was derived from the active conduct of a trade or business. The fact that many of petitioner's sales activities were carried on by employees of petitioner's parent does not prevent petitioner's gross income from being derived from the active conduct of a trade or business. The "active conduct" requirement of the Code is to disqualify corporations which are "inactive" in the sense that they receive investment income rather than business income. Frank v. International Canadian Corporation, 308 F. 2d 520 (C.A. 9, 1962), followed. (3) 95 percent or more of petitioner's gross income was derived from sources without the United States. Respondent's contention that petitioner's title retention was a sham and that *203 "substance of sale test" should be used, rejected. Barber-Greene Americas, A.P. Green Export Company v. United States, Pan American Eutectic Welding Alloys Co., all supra, followed. *204 Ira T. Wender, 1 N. LaSalle St., Chicago, Ill., and Roger M. Quinnan for the petitioner. Julian R. Ettelson and Charles B. Wolfe, Jr., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent has determined deficiencies in petitioner's income tax liability for the fiscal years November 30, 1954, and November 30, 1955, in the amounts of $25,608.51 and $24,455.96, respectively. The issue for decision is whether petitioner qualified as a Western Hemisphere trade corporation under section 109 of the Internal Revenue Code of 1939 for the taxable year ended November 30, 1954, and *205 section 921 of the Internal Revenue Code of 1954 for the taxable year ended November 30, 1955. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. Petitioner, Babson Bros. Export Co., (hereinafter sometimes referred to as Export) was incorporated under the laws of Illinois on July 19, 1951, and has its principal office at 2845 West 19th Street, Chicago, Illinois. Since November 12, 1951, Export has been a wholly-owned subsidiary of Babson Bros. Co. (hereinafter referred to as Babson). Export filed its income and excess profits tax returns for the fiscal year ended November 30, 1954, and its income tax return for the fiscal year ended November 30, 1955, on an accrual basis of accounting with the district director of internal revenue at Chicago, Illinois. Export was organized primarily to engage in the business of buying and selling dairy farm equipment as a Western Hemisphere trade corporation. From the date of its organization through November 30, 1955, Export purchased dairy farm equipment exclusively from Babson and related companies located in the middle western United States and sold it exclusively to customers *206 located outside the geographical limits of the United States and within Canada, Central and South America and the West Indies. Export intended to and did assume the risk of loss and retain the title and beneficial ownership of its merchandise until the goods reached their foreign destination. Petitioner was not licensed to do business in any foreign countries within the Western Hemisphere, did not maintain an office, have any property, real or personal (other than merchandise in transit), or actually have any employees regularly engaged in conducting its affairs outside of the United States. Prior to the time Export was organized, Babson had been selilng dairy farm equipment in the Western Hemisphere. In the early summer of 1951, Babson sent a letter to its customers in Central and South America and the West Indies announcing the anticipated incorporation of Export. The letter read substantially as follows: We wish to announce to our valued distributors, customers and friends that on and after July 19, 1951, the export business of Babson Bros. Co. in the Western Hemisphere will be handled by Babson Bros. Export Co. In view of the steady increase in the volume and importance of *207 this trade, it is felt desirable to give it the preferred attention required by handling it through a separate company whose personnel and management will be especially prepared and trained to carry on International Commerce. The terms offered to the trade will be the usual and current, except that Babson Bros. Export Co. will assume all risk to the merchandise from warehouse to warehouse and, accordingly, will retain title to the goods until the shipment reaches the customer's warehouse. Ocean freight, insurance and clearnance charges will be included as a part of the charges. Shortly thereafter, a letter which read substantially as follows was sent to the same customers under Export's letterhead: We are pleased to announce the incorporation of Babson Bros. Export Co. This company will handle the export business in the Western Hemisphere formerly handled by Babson Bros. Co.
The terms of sale will be the same as before, with the exception that Babson Bros. Export Co. will assume all risk to merchandise from warehouse to warehouse and will retain title to the merchandise until the shipment reaches your warehouse. Ocean freight, insurance and clearance charges will be included *208 as part of our charges. All future orders and correspondence should be addressed to and made in the name of Babson Bros. Export Co.
We are preparing a very simple form of an Agreement which will outline the terms of sale, will make our future trade relations clear, or will prevent any possible misunderstanding. As soon as the Agreement is prepared we will send a copy to you for your consideration and approval. Looking forward to serving you in the future to your entire satisfaction as Babson Bros. Co. has done in the past. Subsequently, Export entered into and maintained distributorship agreements with companies located in Canada, South and Central America and the West Indies. The agreements provided substantially as follows: BABSON BROS. EXPORT CO. DISTRIBUTORSHIP AGREEMENT This Agreement between BABSON BROS. EXPORT CO., an Illinois corporation, of 2843 West 19th Street, Chicago 23, Illinois, hereinafter called ["Export"] and…, hereinafter called "Distributor" WITNESSETH [EXPORT] AGREES as follows: Territory: [Export] is engaged in the sale and distribution of dairy farm machinery and equipment in the Western Hemisphere outside of the United States of America *209 and its possessions and territories, and markets such products under the trade mark "SURGE". [Export] hereby grants to Distributor the exclusive right to sell Surge dairy farm machinery and equipment in the following territory: - DISTRIBUTOR AGREES as follows: Inventory: To carry an adequate stock of Surge merchandise and repair parts to take care of the [Export] line of [Export] business to best advantage. List of Users: To maintain a complete and up-to-date list of all Surge Users in the above territory and keep [Export] supplied with a duplicate copy. Installation Instructions: To make a proper installation of all Surge Milkers and other equipment and thoroughly instruct the new user in the proper operation of the machine, including its care and cleaning. Sales of Promotion: To promote the sale of Surge products in every dairy center, either directly or by means of branches or dealers, and to cooperate in sales promotion such as showing educational films, obtaining lists of prospective customers and taking photographs of Surge users and installations for advertising purposes. IT IS MUTUALLY AGREED as follows: Passage of Title: The ownership, right to possession, *210 legal title and risks of loss or damage to merchandise sold by [Export] to Distributor shall remain with [Export] until the shipment reaches Distributor's warehouse. This reservation of legal title, right to possession and risk of loss or damage shall apply regardless of how the merchandise is shipped, whether by ocean freight, rail freight, air, express, mail or parcel post, and regardless of to whom consigned, whether to [Export] or its agent, Distributor or its Agent, or to an agent for both parties. Unfilled Orders: for merchandise not in transit on the cancellation or expiration date of this Agreement shall be deemed cancelled and void. Assignment: This Agreement may not be transferred or assigned without the written consent of [Export] and any assignment or transfer of any interest herein without the written consent of [Export] shall be void. Duration and Termination: This Agreement becomes effective upon the date of its approval by [Export] and shall remain in effect until December 31st, 1952. It may be cancelled at will by either party upon fifteen days' written notice. At expiration, it may be renewed only by the written endorsement of [Export] or by a *211 properly approved new contract. ACCEPTED Date Distributor By: At: APPROVED at Chicago, Illinois on…. BABSON BROS. EXPORT CO.
By: The first series of agreements were executed by Export and sent to its distributors in September 1951. These agreements were thereupon executed by the distributors and returned to Export. Subsequently, by letters of endorsement, Export extended the terms of the foregoing agreements to December 31, 1953. On February 19, 1953, Export executed a new distributorship agreement to be effective through December 31, 1953, and forwarded it to a new distributor in Uruguay. The agreement was executed by the distributor on February 25, 1953, and returned to Export. This agreement was similar in all respects to the ones existing with other distributors, except for the following paragraph: Passage of Title: It is specifically understood and agreed to by both the vendor and the purchaser herein that an essential and controlling condition of this contract of sales is that the title, ownership, right to possession and risks of loss or damage to the merchandise which is the subject of this transaction shall remain in the vendor until the shipment physically *212 arrives and is discharged at the port of entry in the importing country, regardless of any implication or statement to the contrary which may appear on any other document or instrument arising in the execution of any sales hereunder. This reservation of title, right to possession and risk of loss or damage shall apply * * * regardless of to whom consigned, whether to the seller, his agent, the customer or his agent, or to any agent for both. All sales shall be made on the basis of no arrival, no sale. On December 10, 1953, Export executed new distributorship agreements which were to be effective until December 31, 1954, and forwarded them for execution by its distributors. The agreements were executed by the distributors and returned to Export. Each of the foregoing agreements were similar to the original distributorship agreements executed in 1951 except for the following paragraph: Passage of Title: It is specifically understood and agreed to by both the vendor and the purchaser herein that the title, ownership, right to possession and risks of loss or damage to the merchandise which may be the subject of any sales transaction arising under this Agreement shall remain in the *213 vendor until the shipment physically arrives and is discharged at the port of entry in the importing country, regardless of any implication or statement to the contrary which may appear on any other document or instrument arising in the execution of any sales hereunder. This reservation of title, right to possession and risk of loss or damage shall apply regardless of how the merchandise is shipped, whether by ocean freight, rail freight, air express, mail or parcel post, and regardless of to whom consigned, whether to the seller, his agent, the customer or his agent, or to any agent for both. All sales shall be made on the basis of no arrival, no sale. In December 1954, Export again entered into new distributorship agreements with its distributors. These agreements were to be effective from that date until December 31, 1955. The agreements were executed by the distributors and returned to Export. These agreements were substantially the same as those previously executed. Occasionally, a distributor placed a purchase order with Export and requested that the merchandise be shipped directly to the distributor's customer. When merchandise was sold under these circumstances, the equipment *214 was either paid for by a letter of credit or by check from either the customer or distributor. If the customer paid for the merchandise directly, a credit memorandum was issued to the distributor for the difference between the sales price of the merchandise and the dealer's cost. In addition to its sales to and through distributors, Export also sold merchandise directly to other customers located in Canada, Central and South America. These transactions constituted a very minor part of Export's total sales. In each of the taxable years ending on November 30, 1952, through November 30, 1955, more than 98 percent of Export's sales and gross income was derived from or through distributors with whom it had written distributorship agreements. In addition to its distributors, Export appointed agents in the various foreign countries to which its goods were shipped and authorized them to endorse shipping documents on its behalf. A bank or customs broker in the destination country was usually designated to serve as its endorsing agent. The appointment letters were in substantially the following terms: Dear Sir: We hereby constitute and appoint you as our Agent for the sole and limited *215 purpose of endorsing Bills of Lading and writing Delivery Orders addressed to Air Carriers and Postmasters at various locations in your country, instructing and authorizing them to deliver to customers air express shipments or parcel post packages which will be shipped to the undersigned as consignee. Please indicate your acceptance of this appointment by signing and returning a copy of this letter. Sincerely yours, BABSON BROS. EXPORT CO.
By: Accepted: (Agent's Name) By: Date: Glenn G. Roberts (hereinafter referred to as Roberts) had been an employee of Babson since 1914. In 1951, he was appointed to take charge of the sales, correspondence and paper work relating to Export's sales to foreign countries. In 1951, Emil Limes (hereinafter referred to as Limes) began working for Export. Prior to this time, Limes had been employed by Babson and had been in charge of selling merchandise to Central and South America. Limes assisted Roberts in the conduct of Export's sales to customers in the Western Hemisphere. Because of his fluency in Spanish, Limes did a considerable amount of correspondence work with Latin American customers. All incoming orders and correspondence *216 from foreign countries were received and opened in Babson's mail opening department. When orders were received from one of Export's distributors, Roberts routed the order to Export. If an order was received from one of Export's distributors but addressed to Babson, Roberts sought to have the distributor change the order to Export. In the instances where this occurred, if it was not possible for the distributor to change the order, Babson handled it. After an order was received, the equipment was ordered from one of Babson's plants in or near the Chicago area. When the equipment was ready for delivery, invoices, sight drafts, if used, and other necessary documents were prepared or obtained by Roberts and the people assisting him. Unless Export was shipping small parts by parcel post, a freight forwarder was contacted to obtain shipping space. Thereafter, the freight forwarder completed the consular invoices and the customs declarations. The goods were then shipped to their foreign destination, normally consigned to the order of Export, with instructions to notify the distributor or customer. Certain South American countries did not permit shipment on order bills of lading. In these *217 instances the goods were consigned to Export in care of a customs broker serving as its endorsing agent. The shipping documents were forwarded either directly, or through banking channels, to the endorsing agent who endorsed them on Export's behalf and delivered them to the distributor or customer. On each shipment a letter was sent the endorsing agent confirming his authority to act as such on Export's behalf, and giving specific instructions relative to the endorsement of the necessary documents. Generally, invoices sent to Export's customers contained the following statement: The legal title to the merchandise specified in this document shall remain in Babson Bros. Export Co. until the merchandise reaches the customer's warehouse. Occasionally, invoices contained the term "F.O.B." or "C.I.F." or "F.A.S." When used, these terms had reference to the price of the merchandise and not to the title thereto. Export received payment for their goods under several arrangements. Sales to Babson Bros. Co., (Canada) Ltd.[1] (hereinafter referred to as Babson of Canada) were on open account. Sales to other customers were generally made on the basis of a sight draft payable against the *218 shipping documents. Occasionally, payments were made by 60-day sight drafts, 30-day accounts, sight drafts against letters of credit and C.O.D. Throughout the period December 1, 1951, through November 30, 1955, Export was insured against certain losses or damage to merchandise sold to its distributors and customers under a Marine Open Cargo Policy. The policy specified "Loss, if any, payable to Assured [Export] or order." The policy also contained a clause, known as a warehouse-to-warehouse clause, which provided in so far as here material, that: This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the policy for the commencement of the transit and continues * * * until [the goods are] delivered to final warehouse at the destination named in the policy * * *. The amount of insurance on each shipment, as provided by the policy, was the invoice price, freight and other charges plus ten percent thereon. Export viewed the signed notice of transfer of title received from its *219 endorsing agents as an indication that the sale was completed and the transaction closed. If Export had not received the notice of transfer of title for a shipment, the goods were considered to be in transit. Goods in transit were considered to be Export's property and were included in its inventory on its book of account and its tax returns. On January 13 and 14, 1955, Export purchased 1,000 shares of stock of the Algoma Steel Company, a Canadian corporation, on the Toronto Stock Exchange. The stock was held in a safe-keeping account with the Royal Bank of Canada, Toronto, Ontario. On July 15 through July 21, 1955, all of these shares were sold on the Montreal and Toronto Stock Exchanges. Export's gain from the sale of the Algoma Steel Company stock in 1955 was $20,241.23. The following schedule indicates Export's sales, cost of sales, and gross profit on sales of dairy farm equipment as shown on its Federal income tax returns: Period
Ending
Novem-
Gross Profit
ber 30
Sales
Cost of Sales
on Sales
1952
$342,111.62
$226,796.00
$115,315.62
1953
527,273.43
356,551.39
170,722.04
1954
596,333.33
404,645.26
191,688.07
1955
668,493.53
449,467.68
219,025.85
*220 During the period December 1, 1951, through November 30, 1955, Export realized income from sources other than sales to distributors and customers, as follows: Period
Ended No-
vember 30
Amount
Nature of Income
1952
$ 3.60
Interest Income
1953
16.00
Interest Income
1954
1955
20,241.23
Gain from sale of
Algoma Steel Stock.
Export's expenses, as per its books and records and tax returns for each of the taxable years ended November 30, 1952, November 30, 1953, November 30, 1954, and November 30, 1955, were as follows: Export's Expenses for the Taxable Year Ended November 30 Expense
1952
1953
1954
1955
Salaries & Wages
$ 5,950.00
$ 3,334.22
$ 7,828.32
$ 3,942.81
Rent
240.00
240.00
240.00
240.00
Interest
2,076.50
Taxes
238.33
144.73
290.77
303.08
Advertising
4,498.61
Freight & Postage
4,980.69
1,230.54
2,486.70
4,486.40
Shipping Supplies & Expenses
2,753.36
1,505.85
1,542.04
2,418.58
Insurance
35.58
37.20
37.20
37.20
Office Expense
2,223.41
1,749.82
2,285.87
2,845.98
Telephone
60.00
60.00
60.00
60.00
Employees' Group Insurance
15.60
13.85
30.31
38.06
Selling and Travel
1,986.92
11,976.69
891.58
Miscellaneous
418.63
Totals
$23,072.08
$10,303.13
$26,777.90
$15,682.32
*221 The names of petitioner's employees whose salaries were paid directly to them by petitioner, the duration of these payments and the amounts paid are as follows: Employee's
Monthly
Period
Name
Payments
July 1951-Jan. 1953
Emil Limes
$ 350.00 [2]
Feb. 1953
0
Mar. 1953-July 1953
J. C. Pradilla
250.00 [3]
Aug. 1953-June 1954
J. C. Pradilla
350.00 [4]
July 1954
T. Crawford
2,125.00
Aug. 1954-Dec. 1954
T. Crawford
708.33
Jan. 1955
0
Feb. 1955-Sept. 1955
Glenn Roberts
323.04 [5]
Oct. 1955
Charles L. Cole
213.64
Nov. 1955
Charles L. Cole
275.00
In the notice of deficiency respondent determined that petitioner did not qualify as a Western Hemisphere trade corporation and, therefore, disallowed the exemption, credits and special deductions claimed by petitioner under *222 sections 454(f) and 26(i) of the 1939 Code and section 922 of the 1954 Code. For the taxable year ended November 30, 1955, respondent reallocated the following expenses from Babson to Export: Officers' salaries
$ 5,000.00
Advertising
2,337.18
Additional Costs
6,000.00
Total
$13,337.18
During the period December 1, 1951, through November 30, 1955, Export was a corporation all of whose business was done in the countries of North, Central and South America and the West Indies. For the three-year period from December 1, 1951, through November 30, 1954, and from December 1, 1952, through November 30, 1955: (a) at least 90 percent of Export's gross income was derived from the active conduct of a trade or business and (b) 95 percent or more of Export's gross income was derived from sources without the United States. Opinion The issue is whether petitioner qualified as a Western Hemisphere trade corporation under section 109[6] of the 1939 Code and section 921 of the 1954 Code. If petitioner qualifies, it is exempt from excess profits taxes pursuant to section 454(f) [7] of the 1939 Code and is entitled to the credit provided by section 26(i) [8] of the 1939 *223 Code and the special deduction provided for in section 922 [9] of the 1954 Code. In addition, petitioner will be entitled to a refund for the taxable year ended November 30, 1955, because respondent has reallocated certain expenses from Babson to Export. *224 Respondent's first contention [10] is that the legislative history of sections 109 and 921 indicates that Congress did not intend to permit an export subsidiary, such as petitioner, to qualify as a Western Hemisphere trade corporation. Respondent maintains that in order to qualify as a Western Hemisphere trade corporation, a corporation must be present and conducting an active trade or business "in foreign countries within the Western Hemisphere." *225 The same argument was made and rejected by this Court in Barber-Greene Americas, 35 T.C. 365 (1960) (respondent's appeal dismissed) and Pan American Eutectic Welding Alloys Co., 36 T.C. 284 (1961). The gravamen of respondent's contention is that we reconsider our decisions in those cases; however, respondent has not presented anything that was not thoroughly considered therein. On the basis of the aforementioned cases and A. P. Green Export Company v. United States, 284 F. 2d 383 (Ct. Cl., 1960), we also reject this contention. Respondent's second contention is that, in any event, petitioner did not derive at least 90 percent of its gross income from the active conduct of a trade or business. Respondent contends that Export was not engaged in the active conduct of a trade or business. To support this position, respondent maintains that Export never had more than one employee on its payroll and that all of Export's sales activities were carried out by employees of Babson. There is no merit in respondent's contention. The income on which respondent seeks to tax Export did not have its origin in some passive activity, e.g., dividends or *226 interest. The income was derived from sales activities which is income from the active conduct of a trade or business. The essence of respondent's argument is that Export's income was earned by Babson; hence, Export could not have been carrying on an active trade or business. If respondent's contention were correct, Export would have no taxable income ( Lucas v. Earl, 281 U.S. 111 (1930)) and this case would be at an end because it would be immaterial whether or not Export qualified as a Western Hemisphere trade corporation. [11] It is clear that if petitioner had taxable income, it came from the active conduct of a trade or business.
Frank v. International Canadian Corporation, 308 F. 2d 520 (C.A. 9, 1962), affirming the District Court, involved a factual situation substantially similar to that in the instant case. In rejecting substantially the same argument [12] which *227 respondent has made herein, the Court of Appeals stated at pages 525-527: The meaning which the Commissioner contends should be given "active conduct" as used in § 109(b) is, however, contrary to a majority of the authorities. The "active conduct" requirement of § 109(b) is to disqualify corporations which are "inactive" in the sense that they receive investment income rather than business income. [12][13] And since all International's income came from the sale of chemical products, more than 90% of its gross income "was derived from the active conduct of a trade or business" within the meaning of § 109(b). *228 The Commissioner's argument that International was inactive - or, "inert" - is based on his contentions that (1) Washington had been doing business with Alaska Pine and its predecessor for over twenty years; (2) Washington, not International, performed all the activities "necessary" to the sale of chemicals; and (3) International could not conduct any sales activities since it had no source of supply, customers, plant or employee organization. We consider each in turn. First, the Commissioner argues that because Alaska Pine and its predecessor had been doing business with Washington for over twenty years, International did not actively conduct a trade or business. This argument is without merit. The Commissioner advanced a similar contention in Polak's Frutal Works, Inc., 1954, 21 T.C. 953. The Tax Court denied the Commissioner's contention that income should be allocated between the different entities pursuant to either § 22(a) or § 45 of the Internal Revenue Code after having made the following findings of fact: "After formation of Export, the same customers formerly served by Frutal were then served by Export and later Export, Inc. *229 The same sales agents were used as had formerly been used by Frutal. The list of Frutal's export customers was turned over to the export entity, as well as files relating to the export trade. "After Export was formed, it wrote letters to all of Frutal's former agents, advising that any agreements between the agents and Frutal would remain unchanged except that the partnership 'will be substituted' for Frutal. In an accompanying letter, Frutal advised these same agents that there would be no changes in price policies, quality or merchandise, or in the manner of packing and labeling the products. Frutal further advised that '* * * the transfer of all existing contracts between ourselves and you will merely involve the substitution of the name of Frutal Export Company to effect the contractual relationship between yourselves and the new company.'" 21 T.C. at 966-967. * * * The district court's findings of fact show that Washington had good business reasons for forming International (as a Western Hemisphere trade corporation or otherwise) to handle sales with Alaska Pine. To qualify *230 as a Western Hemisphere trade corporation, the business of the qualifying corporation need not be restricted to new business developed after its incorporation; i.e., it cannot be said that a Western Hemisphere subsidiary cannot be formed to take over business previously done by its parent organization. Polak's Frutal Works, Inc., supra; see also A. P. Green Export Co. v. United States, Ct. Cl., 1960, 284 F. 2d 383. * * * Secondly, the Commissioner contends that International was not active within the meaning of § 109 because Washington performed all the activities necessary to the sale of chemicals; i.e., Washington paid certain persons who opened International's mail, typed order blanks for International, and sent one copy of the order to the shipping department and another copy to the invoicing clerk. The Commissioner advanced a similar argument in A. P. Green Export Co. v. United States, supra, but the Court of Claims there held that merely because the parent corporation's employees performed all of the subsidiary's work did not, in and of itself, disqualify the subsidiary as a Western Hemisphere trade corporation. In addition, International, *231 in the case at bar, employed and paid Mr. Nielson who not only kept International's books but also reviewed all paper work, prepared export declarations and customs papers, handled correspondence, and coordinated instructions received from Alaska Pine with Washington's traffic, production, and shipping departments. Moreover, as in the A. P. Green Export case, supra, International here paid a monthy management fee to Washington, part of which was in payment for the routine services which Washington performed for International and which were not paid for in other ways. The Commissioner does not show where the district court was clearly erroneous; nor does he answer the cases above cited by the district court and the appellee, which support the judgment below. * * * Lastly, the Commissioner argues that International could not conduct any sales activities since it had no source of supply, customers, plant or employee organization. As has been shown, a parent organization can transfer its selling operations to a subsidiary and the subsidiary can still qualify as a Western Hemisphere trade corporation *232 within § 109. A. P. Green Export Co. v. United States, supra; Barber-Greene Americas, Inc., 1960, 35 T.C. 365; Polak's Frutal Works, Inc., supra. The Commissioner cites no statutes, regulations, or cases which require a corporation to own, rather than to rent, office space. Nor was there here reason for International to own warehouse space. And though Washington owned the one-ton shipping containers, Washington was compensated for their use since a container charge was part of the cost of sales on which International paid a six per cent profit to Washington. The Commissioner shows no error in law or fact in the district court's judgment. The district court cannot, therefore, be held to have committed error when it rejected this argument of the Commissioner. Therefore, even if the Commissioner was not contending for an erroneous interpretation of the term "active conduct" as used in § 109(b), the facts fully support the district court's judgment that International qualified within the meaning of § 109(b). We hold that Export derived 90 percent or more of its gross income from the active conduct of a trade or business. Frank v. International Canadian Corporation, supra. *233 Respondent's final argument is that Export did not derive 95 percent or more of its gross income from sources outside the United States. Respondent contends that petitioner's title retention was a sham because it had no commercial purpose but, rather, was done solely to avoid United States taxes. Respondent also contends that under the "substance of the sale test" Export's sales occurred in the United States. There is no merit in respondent's argument. There was no sham in Export's title retention. The substance of what happened is exactly the form it took. Export intended to and did assume the risk of loss and retain title to its merchandise until the goods reached their foreign destination. More than 98 percent of petitioner's sales and gross income were derived from sales directly to or through distributors with whom Export had written agreements. These agreements specifically provided that Export was to retain title to the merchandise until it reached the foreign destination. Contrary to respondent's position, so long as there were two acceptable methods of selling merchandise, i.e., shipment contract or destination contract, Export was not obligated to choose the one which *234 would result in the greatest tax. In Barber-Greene Americas, Pan American Eutectic Welding Alloys Co., and A. P. Green Export Company v. United States, all supra; respondent took substantially the same position as taken herein. In each case his argument was rejected. We find these cases factually indistinguishable from the instant case except for possibly minor and irrelevant points. On the basis of the foregoing cases we also rejected respondent's contention. We hold that petitioner qualifies as a Western Hemisphere trade corporation under section 109, 1939 Code, and section 921, 1954 Code. Decision will be entered under Rule 50. Footnotes
1. During the taxable years ended November 30, 1952, through November 30, 1955, more than 85 percent of Export's sales were made to Babson of Canada.↩
2. Limes received an additional $1,750 in the month of November 1952. ↩
3. Pradilla only received $221.72 in March 1953; $187.50 in June 1953; and $125 in July 1953. In November of 1953, Pradilla received $200 in addition to his salary of $350 per month. ↩
4. In June of 1954, Pradilla received an additional $350. ↩
5. In July 1955, Roberts received an additional $161.52.↩
6. SEC. 109. WESTERN HEMISPHERE TRADE CORPORATIONS. For the purposes of this chapter, the term "western hemisphere trade corporation" means a domestic corporation all of whose business is done in any country or countries in North, Central, or South America, or in the West Indies, or in Newfoundland and which satisfies the following conditions: (a) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and (b) If 90 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business. Section 921↩ of the 1954 Code is, in so far as material herein, substantially identical. 7. SEC. 454. EXEMPT CORPORATIONS. The following corporations, except a member of an affiliated group of corporations filing a consolidated return under section 141, shall be exempt from the tax imposed by this subchapter: * * *
(f) Domestic corporations satisfying the following conditions: (1) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and (2) If 50 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business. ↩
8. SEC. 26. CREDITS OF CORPORATIONS. In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax - * * *
(1) Western Hemisphere Trade Corporations. - In the case of a western hemisphere trade corporation (as defined in section 109) - * * *
(2) Taxable years beginning after March 31, 1951, and before April 1, 1954. - In the case of a taxable year beginning after March 31, 1951, and before April 1, 1954, an amount equal to 27 per centum of its normal-tax net income computed without regard to the credit provided in this subsection. (3) Taxable years beginning after March 31, 1954. - In the case of a taxable year beginning after March 31, 1954, an amount equal to 30 per centum of its normal-tax net income computed without regard to the credit provided in this subsection. ↩
9. SEC. 922. SPECIAL DEDUCTION. In the case of a Western Hemisphere trade corporation there shall be allowed as a deduction in computing taxable income an amount computed as follows - (1) First determine the taxable income of such corporation computed without regard to this section. (2) Then multiply the amount determined under paragraph (1) by the fraction - (A) the numerator of which is 14 percent, and (B) the denominator of which is that percentage which equals the sum of the normal tax rate and the surtax rate for the taxable year prescribed by section 11.↩
10. Although respondent has made no argument on brief, he did object to a requested finding of fact that all of Export's business was done in the Western Hemisphere. Respondent cited six documents which referred to cream separators manufactured in Belgium. One of the documents referred to by respondent was a price list from the Belgian Company that contained "Babson's" name rather than that of Export. Thus, it would appear that Babson was the real importer involved. The remaining five documents were letters to or from one distributor. Two of these letters were under the signature of "Babson" and not Export. While it is true that two of the remaining letters were under Export's signature and one was addressed to Export and there were references to cream separators purchased from Belgium, we are satisfied that if there were any such transactions they were handled by Babson rather than Export. We have carefully examined Export's records for the years in question and find that there were, in fact, no purchases made from Belgium. In addition, we find no evidence that any cream separators were ever, in fact, sold by Export. Even assuming there were some purchases from Belgium, this would not necessarily be fatal to petitioner's qualification as a Western Hemisphere trade corporation. Otis Elevator Company v. United States, 301 F. 2d 320↩ (Ct. Cls., 1962). See also T.I.R. 469 (April 22, 1963).
11. Sections 109 and 921↩, supra, clearly state that a corporation will qualify as a Western Hemisphere trade corporation if, among other qualifications, "90 per centum or more of its gross income * * * was derived from the active conduct of a trade or business." [Italics supplied]
12. The government argued: that Congress intended to deny the tax advantages available to § 109 corporations "to domestic corporations which derived their income from passive activities, a non-competitive course of conduct, as in the case at bar." (Italics added.) And, contends the Commissioner, the most that can be said for International's role in this case "is that it was a mere conduit for income attributable to the activities of Washington." * * * The undisputed facts, urges the Commissioner, show that International was "inert;" and, therefore, it was clear error for the district court to hold that International was actively engaged in a trade or business. ↩
13. "The term 'active conduct of a trade or business' is also used in § 251. 'The object of the law, obviously, is to prevent a corporation from obtaining the Western Hemisphere trade corporation credit on investment income. P. H. Fed. Tax Service, 1953, Vol. I, Par. 4686. That is the object of 26 U.S.C.A. § 109 as well." Towne Securities Corp. v. Pedrick, 53-2 USTC Par. 9585, p. 48, 601, 44 AFTR 1258 (D.C.N.Y. 1953). "The test for qualification as a Western Hemisphere trade corporation is in terms of gross income derived from the active conduct of a trade or business. Interest and dividend income do not meet the test. Income from sales activities, however, is income from the active conduct of a trade or business, and the source of sales income is without the United States if the place of sale is outside the United States." Mertens, Law of Federal Income Taxation (Zimet Revision), Vol. 8, § 45.76, p. 205 (omitting cases cited in notes). "The fourth requirement, i.e., 90 percent of gross income derived from the active conduct of a business, has never presented many problems of interpretation. The object of the law obviously is to prevent a corporation from obtaining the Western Hemisphere Trade Corporation credit on investment income." Terrence M. Flynn, Western Hemisphere Trade Corporations: Quo Vadis?, 12 Tax L. Rev. 413, 419↩ (1956-1957).