KEWANEE OIL COMPANY AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5965–72. Filed August 29, 1974.

*C. Walter Randall, Jr.*, for the petitioner.
*Albert Squire*, for the respondent.

RAUM, *Judge:* The Commissioner determined deficiencies in income tax as follows:

| TYE Dec. 31— | Deficiency |
| --- | --- |
| 1965 | $1,788,355.04 |
| 1966 | 1,408.51 |

As a result of concessions by the parties, the only remaining issue for decision is whether Canadian Kewanee Ltd., one of the corporate petitioners herein, qualified as a Western Hemisphere trade corporation in the year 1965, thereby entitling it to the deduction provided in section 922, I.R.C. 1954. The precise question presented is whether Canadian Kewanee Ltd.'s income from the sale of the bulk of its operating assets may be deemed to have been derived from the "active conduct of a trade or business" within the meaning of section 921(2) of the Code. All of the facts have been stipulated.

Petitioner Kewanee Oil Co. (Kewanee) is a Delaware corporation with its principal executive offices situated in the vicinity of Philadelphia, Pa. On behalf of itself and its subsidiaries Kewanee filed a consolidated Federal income tax return for its taxable year ended December 31, 1965, with the district director of internal revenue at Philadelphia, Pa. Among the subsidiary corporations included in the consolidated return was Canadian Kewanee Ltd. (Canadian Kewanee), a Delaware corporation wholly owned by Kewanee.

From the time of its formation in 1957, Canadian Kewanee conducted all of its operations in Canada, maintaining its business office in Calgary, Alberta. At the outset of its operations, Canadian Kewanee was engaged in the purchase and development of petroleum leases. Neither Kewanee nor any of its subsidiary corporations, including Canadian Kewanee, ever had facilities for refining the crude oil which they located and produced. They were what are known as "producers" only; they sold their oil and gas production in its crude state. By the close of the year 1958, Canadian Kewanee had completed 9 oil wells and work was in progress on 15 others. In addition, it had drilled a nonproductive, or dry, "wildcat well." (As used herein, a

"wildcat well" means a well drilled in an area in which there are no existing producing wells.) Canadian Kewanee financed its operations through direct, interest-bearing loans from its parent corporation, Kewanee, and to a lesser extent through bank loans guaranteed by Kewanee.

Canadian Kewanee's production grew steadily in 1959 and 1960, when it made large purchases of semiproven undeveloped leaseholds and embarked upon a limited wildcat program through "farmouts." (As used herein a "farmout" is an arrangement by which the owner of an oil lease contracts with another party for the latter to drill a well at the latter's expense in consideration of receiving a percentage of the production from the well if it proves productive.) During 1960 it drilled a total of 41 wells, of which 34 were producing oil wells, 3 were producing gas wells, and 4 were dry holes. Its net daily average production of oil was 1,225 barrels in 1959 and 1,623 barrels in 1960.

In the course of 1961 and 1962, Canadian Kewanee's management limited the company's exploratory activities while it increased the daily average petroleum production. In line with its revamped operating policy, Canadian Kewanee trimmed its leasehold inventory during 1962 from 187,204 net undeveloped acres to 155,096 net undeveloped acres. However, during the year it obtained an estimated 3,016,800 net barrels of additional reserves, of which 1,852,810 were acquired by purchase of proven wells and the balance of 1,163,990 by drilling. In 1962, Canadian Kewanee participated in the drilling of 13 wells, 11 of which were successful. Its daily average production rose from 2,266 net barrels in 1961 to 2,554 net barrels in 1962, and its gross annual revenues in 1962 were approximately $2,800,000.

In 1963 Canadian Kewanee's daily average production was up to 3,000 net barrels; in 1964 it further increased to 3,780 net barrels. Although its undeveloped acreage had risen to 180,486 net acres in 1963, it fell to 143,068 net acres by the end of 1964. In 1963 Canadian Kewanee obtained an estimated 4,617,992 net barrels of additional reserves, of which 1,167,559 were acquired by purchase of proven wells and the balance of 3,450,433 by drilling. In all, during 1963 and 1964 Canadian Kewanee participated in the drilling of 77 wells, of which 11 were wildcat wells. Only 2 of the 11 wildcat wells were successful as compared to 58 of the 66 developmental wells. Moreover, in 1963 Canadian Kewanee purchased the entire interest in two Canadian petroleum corporations, both of which were integrated into Canadian Kewanee's operations. Despite the apparent lack of success with respect to wildcat wells, Kewanee's Annual Report to Stockholders in both 1963 and 1964 spoke of expanding Canadian Kewanee's activity in that regard.

In the course of operating its business Canadian Kewanee's indebtedness to Kewanee had grown steadily until, on December 31, 1964, it stood at $28,279,678.64; Canadian Kewanee was also indebted to two Canadian banks in the aggregate amount of $442,415 at that time. Notwithstanding the steady growth in its operations, in no year prior to 1965 did Canadian Kewanee have taxable income.

As early as October 1964, Canadian Kewanee engaged in preliminary discussions with several large oil companies regarding the possibilities of exchanging or selling oil reserves, but without reaching agreement. On April 12, 1965, Triad Oil Co., Ltd. (Triad), a Canadian corporation, submitted a letter offer to Canadian Kewanee in which it proposed to purchase all of Canadian Kewance's producing oil and gas leases together with the equipment located thereon as well as certain theretofore undeveloped acreage. Canadian Kewanee accepted Triad's offer which was thereafter formalized in two related written agreements each dated as of June 11, 1965. The agreements were performed according to their terms by which Canadian Kewanee was to receive over a period of 3 years a total of $27,614,191.94, of which amount $2,641,850.43 represented proceeds from the sale of tangible assets and $24,972,341.51 represented proceeds from the sale of its oil and gas rights. Canadian Kewanee received $19,477,255.95 in cash at the closing in July 1965, which it immediately turned over to Kewanee in satisfaction of $2,725,203.29 of accounts payable to Kewanee and $16,752,052.66 of its notes held by Kewanee. At the end of the year 1965, Canadian Kewanee's indebtedness to Kewanee, as evidenced by outstanding notes, was $12,089,471.

The sale of the tangible assets to Triad resulted in Canadian Kewanee's realization of a loss in the amount of $1,701,913.12; the sale of the oil and gas rights resulted in the realization of a profit in the amount of $16,382,220.54.

As part of the sale, Canadian Kewanee assigned to Triad, in addition to its producing properties, leases covering 103,866 net undeveloped acres, thereby reducing its holdings to 43,371 net undeveloped acres. Immediately following the sale to Triad, Canadian Kewanee sold and assigned an additional 20,301 net undeveloped acres to a wholly owned subsidiary company, leaving Canadian Kewanee with only 23,070 net undeveloped acres.

In the first 4 months of 1965 Canadian Kewanee had participated in the completion of 16 wells of which half were developmental wells and the others wildcat wells; in the last half of 1965, after the Triad sale, it participated in the completion of four wells, all wildcat wells of which only one was successful. Just prior to the Triad sale, Canadian Kewanee's daily average production was in excess of 4,000 barrels of oil and approximately 6½ million cubic feet (MMCF) of

gas. In July it had no production of oil and during the last 5 months of the year its daily average production was only 12.8 net barrels; it had no production of gas whatever for several years after the Triad sale. In contrast to the sharp drop in production after the sale in 1965, the number of Canadian Kewanee's regular full-time employees fell modestly, from 28 immediately prior to the sale to 19 at the end of the year.

In Kewanee's Annual Report to Stockholders for 1965, the president reported with respect to the sale:

Our operations in Canada were penalized mainly by sizeable depletion charges resulting from high lease costs. With the capital received from this sale we are in a strong position to compete for acquisitions both within and without the oil industry. We have retained certain acreage and have continued operations in several wildcat joint ventures in Alberta, British Columbia, Manitoba and Saskatchewan. It is our intention to increase activity in these Provinces during the coming year as opportunities arise.

At the close of the year 1965, Canadian Kewanee's undeveloped acreage had increased from 23,070 net acres after the two sales to 87,625 net acres; at the end of 1966 it was 73,217 net acres; at the close of 1967, 194,706 net acres. During 1966, Canadian Kewanee participated in the completion of 16 wildcat wells, 12 of which were dry holes, and 2 developmental wells, one of which was successful. In 1967 it participated in the completion of six wildcat wells, only one of which was producing, and five developmental wells, all of which were successful. In the course of this period, Canadian Kewanee's average daily production rose to 38 barrels of oil; it began to produce gas again for the first time in November 1967, and its daily production thereof reached nearly 2½ MMCF as of the end of the year. Moreover, during 1966 and 1967 it acquired total reserves of 1,923,200 net barrels of oil, all by drilling. In July 1966, Canadian Kewanee also joined with three other companies in a scheduled 3-year exploration program with Canadian Kewanee serving as operator.

On December 31, 1967, Canadian Kewanee sold all of its assets (except cash and certain receivables, including the payment due from Triad) to another wholly owned subsidiary of Kewanee registered to do business in Canada. Thereafter, Canadian Kewanee ceased to do any further business in Canada or elsewhere. At the time of the hearing of this proceeding, Canadian Kewanee had not been formally dissolved but owned no assets whatsoever.

In each of the 3 years 1963, 1964, and 1965 not only did Canadian Kewanee's costs of operations exceed its receipts from sales (exclusive of the receipts from the Triad sales), but other deductions exceeded its other income (exclusive of the receipts from the Triad sales), and the parties have stipulated that its only gross income during the

3-year period was from the sale of its producing and nonproducing leaseholds to Triad. On petitioners' consolidated income tax return for the year 1965, Canadian Kewanee treated the assets sold to Triad as property used in its trade or business and therefore reported the profit and loss arising therefrom pursuant to the provisions of section 1231 of the Internal Revenue Code of 1954. Furthermore, it claimed a Western Hemisphere trade corporation deduction under section 922 in the amount of $3,719,059.41.

The Commissioner disallowed the deduction in full for the stated reason that—

you failed to qualify as a Western Hemisphere trade corporation, as defined by section 921 of the Internal Revenue Code, by reason of the fact that 90% or more of your gross income for the 3-year period ending December 31, 1965 was not derived from the active conduct of a trade or business. * * *

The ultimate issue before us is whether Canadian Kewanee is entitled to the special deduction provided for Western Hemisphere trade corporations by section 922.[1] The answer to this question, though, is to be found in section 921 which defines Western Hemisphere trade corporations and thereby governs the availability of the special deduction. In relevant part, section 921 states:

SEC. 921. DEFINITION OF WESTERN HEMISPHERE TRADE CORPORATIONS.

For purposes of this subtitle, the term "Western Hemisphere trade corporation" means a domestic corporation all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies, and which satisfies the following conditions:

(1) if 95 percent or more of the gross income of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources without the United States; and

(2) if 90 percent or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.

There is no question that Canadian Kewanee, a domestic corporation, conducted all of its business within the prescribed geographic area. It is equally clear that Canadian Kewanee satisfied the geographic source

---

[1] SEC. 922. SPECIAL DEDUCTION.

In the case of a Western Hemisphere trade corporation there shall be allowed as a deduction in computing taxable income an amount computed as follows—

(1) First determine the taxable income of such corporation computed without regard to this section.

(2) Then multiply the amount determined under paragraph (1) by the fraction—

(A) the numerator of which is 14 percent, and

(B) the denominator of which is that percentage which equals the sum of the normal tax rate and the surtax rate for the taxable year prescribed by section 11.

No deduction shall be allowed under this section to a corporation for a taxable year for which it is a DISC or in which it owns at any time stock in a DISC or former DISC (as defined in section 992(a)).

of income test inasmuch as the only gross income it realized in the 3-year period ended December 31, 1965, arose from the aforementioned sale of assets, a transaction wholly confined to Canada. See sec. 862(a)(5) and (6); sec. 1.861–7 (a) and (c), Income Tax Regs. The critical matter in dispute, however, is whether the proceeds of that sale may be considered to have been derived from "the active conduct of a trade or business" thus bringing Canadian Kewanee into compliance with the 90-percent rule set forth in section 921(2).

It is the Commissioner's contention that by selling nearly 100 percent of the assets which it used to produce the regular revenues of its business, Canadian Kewanee in fact disposed of that business. Thus, if the pertinent statutory language is to be accorded its plain meaning, that sale concluded the business, the antithesis of its active conduct, and hence the income therefrom was not "derived from the active conduct" of the business. Petitioners, however, deny that Canadian Kewanee discontinued its business by virtue of the sale to Triad, insisting instead that the sale was within the scope of the company's active business which continued, albeit on a more modest scale, for 2½ years after the sale. Moreover, they point out, even if the sale was made in the course of terminating the business, because the assets sold had been used in the business the proceeds realized therefrom had their source in the active conduct of business and were therefore entirely different from the passive income at which the proscription in section 921(2) is directed.

Both the Commissioner and petitioners agree that this case presents a question of first impression, and we are satisfied that there exists no explicit authority, either statutory or judicial, which tends to clarify, much less to resolve, the issue. The Commissioner has directed our attention to Rev. Rul. 58–56, 1958–1 C.B. 335, which is primarily concerned with consolidated tax return computations and allocations for affiliated groups of corporations which operate in the Western Hemisphere. In respect of Western Hemisphere trade corporations the ruling states, in a seemingly incidental passage without the benefit of any cited authority (p. 336):

Interest received on money loaned and gains from the sale of capital assets as defined in section 1221 of the Code are likewise not regarded as income derived from the active conduct of a trade or business. However, gains from the sale of property used in the trade or business, which are treated as capital gains under section 1231 of the Code, are considered as income derived from the active conduct of a trade or business, unless such sales are made in connection with a complete or partial liquidation of the corporation. * * *

Rev. Rul. 58–56 speaks of "a complete or partial liquidation," terms which normally have reference to the corporate actions dealt with in Code sections 336 and 346 and which are in that sense inapplicable to the situation at hand.[2] There nonetheless remains in the cited passage the connotation of a section 1231 sale by which a corporation terminates a dominant and identifiable field of its activities, to be contrasted with a sale in connection with the regular replacement of equipment. This, argues the Commissioner, was the true impact of the Triad sale upon Canadian Kewanee's business, the gain from which, it follows, was not derived from the active conduct of that business. We agree with the Commissioner.

The so-called "active conduct" requirement of section 921 is not, unfortunately, a self-defining legislative expression; as is so often the case, though, the congressional purpose underlying the Western Hemisphere trade corporation provisions helps to give meaning to the words chosen to accomplish it. Beginning in 1918, every United States corporation with foreign source income has at least to some extent enjoyed relief from the burden of so-called double taxation in the form of a credit against the United States tax for foreign income taxes paid in respect of that income.[3] This treatment conforms to a fundamental policy of our tax system, namely, that a domestic corporation is taxed on its global income, irrespective of its source. The antithetical concept of differential treatment for certain domestic corporations operating in particular regions of the world did not appear in our tax laws until the Revenue Act of 1921. At that time Congress, responding to the alleged plight of certain domestic corporations doing business in the Philippine Islands, granted an exemption from United States corporate income taxes for certain income earned in a United States possession.[4] Such a provision, it was argued, would alleviate the competitive disadvantage suffered by American corporations operating overseas because their nonnative competitors often paid no tax in their home countries.[5]

This innovative deviation from the otherwise established tax policy in respect of "foreign source" income laid the conceptual groundwork

---

[2] See fn. 15 *infra*.

[3] Originally enacted as Revenue Act of 1918, sec. 238, ch. 18, 40 Stat. 1057, 1080–1081 (1919), the credit is currently implemented by secs. 901–906, I.R.C. 1954.

[4] Revenue Act of 1921, sec. 262, 42 Stat. 227, 271. This provision exists today as sec. 931, I.R.C. 1954.

[5] See Surrey, "Current Issues in the Taxation of Corporate Foreign Investment," 56 Col. L. Rev. 815, 831–832 (1956) ; Raskind, "The Western Hemisphere Trade Corporation : A Functional Perspective," 16 Vand. L. Rev. 1, 4–5 (1962).

for subsequent legislative exceptions.[6] In its final form, the excess profits tax of 1940 contained an exemption—introduced as a floor amendment in the House and apparently without any congressional discussion in the debates or reports—for domestic corporations which derived 95 percent of their income from foreign sources and, at the same time, derived half of their income from "the active conduct of a trade or business."[7] When in 1942 the exigencies of war led Congress to raise the corporate surtax rate from 7 to 16 percent, the statute included a complete exemption for a select group of corporations with foreign source income, then designated as Western Hemisphere trade corporations.[8] Here for the first time the term "Western Hemisphere trade corporation" appeared in our revenue laws. The provisions originated in a Senate Finance Committee amendment to the House bill to which the House thereafter acceded.[9] The Senate committee report explained its inclusion as follows:[10]

American corporations trading in foreign countries within the Western Hemisphere are placed at a considerable competitive disadvantage with foreign corporations under the tax rates provided by the bill. To alleviate this competitive inequality, the committee bill relieves such corporations from surtax liability. To obtain this relief 95 percent of the gross income of such companies must be from sources outside the United States. Moreover, 90 percent of their income must be from the active conduct of a trade or business.

During the floor debate in the Senate, Senator George substantially reiterated the explanation pertaining to the newly proposed Western Hemisphere trade corporation which was presented in the Senate report:[11]

Our American corporations trading in foreign countries within the Western Hemisphere are placed at a considerable disadvantage with corporations or-

[6] In 1939, relief for the newly conceived Pan-American trade corporation was enacted. Sec. 152, I.R.C. 1939, added by Revenue Act of 1939, sec. 225, ch. 247, 53 Stat. 862, 881. Introduced originally by the Senate Finance Committee and ostensibly designed to foster American business abroad, the bill permitted domestic corporations actively engaged in business in Central or South America to file consolidated income tax returns with their United States parent companies. S. Rept. No. 648, 76th Cong., 1st Sess., p. 9 (1939). The conditions attached to this privilege were that at least 90 percent of each Pan-American trade corporation's gross income and 80 percent of its parent's gross income be "derived from sources other than royalties, rents, dividends, interest, annuities, and gains from the sale or exchange of stock or securities" and that no part of the Pan-American trade corporation's gross income be United States source income. Although this provision did not involve an exemption from taxation for a category of income, it seemingly did draw upon the Revenue Act of 1921 to the extent that it embodied preferential treatment for a group of geographically defined corporations. The Pan-American trade corporation provision was repealed with respect to taxable years beginning after Dec. 31, 1941. Revenue Act of 1942, sec. 159(b), ch. 619, 56 Stat. 798, 860.

[7] Sec. 727(g), I.R.C. 1939, added by the Second Revenue Act of 1940, sec. 201, ch. 757, 54 Stat. 974, 988.

[8] Secs. 15(b) and 109, I.R.C. 1939, added by Revenue Act of 1942, secs. 105 and 141, ch. 619, 56 Stat. 798, 806, 838.

[9] S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 31, 111 (1942) ; H. Rept. No. 2586, 77th Cong., 2d Sess., p. 43 (1942).

[10] S. Rept. No. 1631, 77th Cong., 2d Sess., p. 32 (1942).

[11] 88 Cong. Rec. 7795 (1942).

ganized under the laws of other countries. In the case of corporations organized under the laws of other countries, there is no tax levied by the home country. In the case of our corporations, we subject them to the full American tax, with credit for the taxes paid to the foreign country.

To alleviate this situation somewhat, and to encourage our American corporations in doing business in the Western Hemisphere, we have provided that such corporations shall be relieved from the surtax if 95 percent of their income is from sources outside of the United States and if 90 percent of their income is from the active conduct of a trade or business.

The resulting tax preference for Western Hemisphere trade corporations exists today in effect as a 14-percentage-point reduction in the tax rate.[12]

Although the statutory history of the Western Hemisphere trade corporation provisions is perhaps less exhaustive than might be desired, we think it nonetheless discloses a clearly articulated legislative purpose upon the basis of which Congress enacted the provisions in question. The critical policy which emerges in the Western Hemisphere provisions, and as previously expressed in the Revenue Acts of 1921 and 1940, was Congress' desire to offset through a tax preference the competitive disadvantage suffered by certain American corporations abroad on account of the less onerous taxes to which their non-American competitors were subject. This encouragement was not, however, without limitations. By means of the source rule and the active conduct requirement Congress quite apparently sought to distinguish, however bluntly, between those corporations which themselves engaged in business activity outside the United States in direct competition with foreign corporations and those which merely invested in others' businesses abroad or otherwise did not engage in directly competitive activity. Our understanding in this respect is not different from that expressed by the few courts which have had occasion to address themselves to the language of this portion of the statute. Cf. *Frank* v. *International Canadian Corporation*, 308 F. 2d 520, 525 (C.A. 9);[13] *Towne Securities Corporation* v. *Rea Forhan Pedrick*, 44 A.F.T.R. 1258, 1259 (S.D. N.Y.); *Babson Bros. Export Co.*, 22 T.C.M. 677, 683–684. It follows that when the "active conduct"

---

[12] The original outright surtax exemption was replaced in 1950 with a deduction computed as a specified percentage of normal tax net income. Sec. 26(i), I.R.C. 1939, added by the Revenue Act of 1950, sec. 122(c), ch. 994, 64 Stat. 906, 920. The Internal Revenue Code of 1954 substituted for this the current formula deduction resulting in a 14-percentage-point tax rate reduction (ignoring the surtax exemption provided by sec. 11(d)). Sec. 922, I.R.C. 1954, ch. 736, 68A Stat. 1, 291.

[13] It is quite true that the court in the *International Canadian* case stated (p. 525) that the active conduct requirement "is to disqualify corporations which are 'inactive' in the sense that they receive investment income rather than business income." But that statement was made in the context of a situation where the taxpayer was engaged regularly and actively in the business of making sales in Canada, and the income in question was derived from such sales. The court obviously did not give any consideration to the applicability of the statute to an isolated transaction of the type before us, and we do not give that language the possible expansive reading that would include such a transaction within the "active conduct" clause.

requirement is read in the context from which it arose, namely the threat of foreign competition, one might well conclude that in passing the Western Hemisphere provisions Congress intended to grant relief to United States business activity in the Americas only to the extent that the beneficiary corporation conducted active business operations abroad vulnerable to the competitive threat posed by the tax-advantaged corporations of other countries.[14]

When translated into the concrete issue of this case, we think that this policy does not permit, much less require, extending preferential tax treatment to Canadian Kewanee in the circumstances of this case. Canadian Kewanee's sale of assets to Triad was not simply a new aspect of its already established oil and gas production business, entitled as such to the same protection from foreign competition as that afforded to the regular, recurring activity necessary to the active conduct of that business. That Canadian Kewanee's sale to Triad exceeded the scope of its ordinary course of business is obvious. By virtue thereof the corporation parted with substantially all of its oil- and gas-producing property and associated equipment, the source of virtually its entire revenues until that time. In addition thereto, it disposed of approximately 70 percent of the net undeveloped acreage it then held. As a result, its oil production immediately dropped to less than 1 percent of its former level, and its gas production ceased altogether at that time. Thus, by reason of that sale, Canadian Kewanee withdrew from competition altogether what had theretofore constituted virtually all of the assets of its business which had been actively employed in competition with others.[15] It is our conclusion that such a sale was not a component of Canadian Kewanee's active business and that it therefore fell outside the range of activities for which the statute accorded favored treatment.

Petitioners have urged that inasmuch as the powers enumerated in Canadian Kewanee's corporate charter included trading or dealing in oil and gas property leases, the Triad sale occurred within the framework of Canadian Kewanee's business. Despite the breadth of its formal corporate powers, however, Canadian Kewanee was not in

---

[14] This understanding of the statutes' purpose conforms well to the Commissioner's position that interest income, which would otherwise constitute "passive" income outside the purview of sec. 921(2), meets the "active conduct" requirement when received from the taxpayer's customers on account of their credit obligations arising from the regular and recurring conduct of the taxpayer's business. Rev. Rul. 65-290, 1965-2 C.B. 241.

[15] To be sure, the transaction did not amount to a distribution in "partial liquidation" of Canadian Kewanee pursuant to sec. 346 (since, among other reasons, there was no redemption of its stock), and therefore the nonrecognition provisions of sec. 336 were inapplicable. Nevertheless, notwithstanding the technical absence of a "partial liquidation" for the special purposes of secs. 336 and 346, the effect of the Triad sale was plainly a substantial contraction of Canadian Kewanee's corporate size and operations—a circumstance that is highly relevant to the entirely different statutory provisions of sec. 921, here under consideration.

fact engaged in the active conduct of a business that involved trading in oil and gas leases, and certainly was not in the business of selling in bulk its *entire* production facilities coupled with all of its proven reserves. Without speculating as to the effect of isolated sales of relatively small properties occurring over an extended period of time, it can confidently be said that Canadian Kewanee did not actively conduct a business of the nature or of the proportions of the Triad sale. That transaction marked the conclusion of the bulk of its business, and it hardly appears to be comprehended within the "active conduct" of a business to which Congress intended to confer special benefits as a protection against foreign competition. In this connection it is a matter of but little moment that Canadian Kewanee undertook to reestablish its business on a comparatively modest scale after the Triad sale.

In light of the foregoing, we hold that the proceeds from Canadian Kewanee's sale of assets to Triad were derived from the termination of the major portion of its business and not from the active conduct thereof; accordingly, Canadian Kewanee did not meet the "active conduct" requirement set forth in section 921 and was therefore not entitled to the deduction provided in section 922. Due to prior concessions made by the Commissioner,

*Decision will be entered under Rule 155.*